ANACAPA LAW GROUP, INC.
Jesse C. Swanhuyser (SBN 282186)
508 East Haley Street
Santa Barbara, CA 93103
Tel: (805) 689-1469
Email: jswanhuyser@alg.law

Attorney for Plaintiff
CALIFORNIA COMMUNITIES AGAINST TOXICS

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA COMMUNITIES AGAINST TOXICS, a public benefit citizen association,<br><br>Plaintiff,<br><br>vs.<br><br>TROJAN BATTERY COMPANY, a Delaware-based limited liability company; TROJAN BATTERY HOLDINGS, LLC, a Delaware-based limited liability company; and DOES 1 through 10,<br><br>Defendants. | Civil Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA COMMUNITIES AGAINST TOXICS ("CCAT" or "Plaintiff"), a California public benefit citizen association, by and through its counsel, hereby alleges:

## I.     INTRODUCTION

1.     This complaint seeks relief for ongoing violations by TROJAN

COMPLAINT                                                        1

BATTERY COMPANY, a Delaware-based limited liability company, and TROJAN BATTERY HOLDINGS, LLC, a Delaware-based limited liability company ("Defendant" or "TROJAN"), and DOES 1 through 10 of both substantive and procedural requirements of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "Act") and the National Pollutant Discharge Elimination System ("NPDES") Permit No. CA S000001, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ, Water Quality Order No. 97-03-DWQ and Order No. 2014-0057-DWQ (collectively referred to as "Permit" or "General Permit"), resulting from polluted stormwater and non-stormwater discharges from the industrial facility at 9440 Anne Street ("Facility") in Santa Fe Springs, California.

2.     Millions of gallons of polluted storm water originating from industrial operations like those conducted at the Facility pour into storm drains and local waterways during every significant rainfall event. The consensus among agencies and water quality specialists is that this pollution accounts for more than half of the total pollution entering surface waters each year.

3.     Industrial facilities, like the Defendant's, that discharge storm water and non-storm water contaminated with sediment, toxic metals, and other pollutants contribute to the impairment of downstream waters and aquatic dependent wildlife, expose people to toxins, threaten public health, and harm the aesthetic and recreational significance Los Angeles' area waterways have for residents and visitors

COMPLAINT

2

alike.

4. These contaminated discharges can and must be controlled to protect public health and allow the ecosystem to regain its vitality.

5. In preparing this complaint, CCAT conducted a comprehensive inquiry into TROJAN and its activities in Santa Fe Springs from 1969 to the present. Specifically, CCAT reviewed: i) all hard-copy documents maintained by the City of Santa Fe Springs for the address in its role as the Certified Unified Program Agency ("CUPA"); ii) all documents available in hard-copy at the Los Angeles Regional Board Water Quality Control Board ("Regional Board") for both terminated and active permits; iii) all documents available on-line in the State Board's Storm Water Monitoring Application and Report Tracking System ("SMARTS") database for both terminated and active permits; and iv) corporate filings available via internet portals for the California and Delaware Secretaries of State. Additionally, on two separate dates, an agent for CCAT circumnavigated the Facility in an automobile as well as on foot. CCAT's agent took digital images, digital videos and notes of relevant activities that were visible from public space, i.e. without entering private property.

6. CCAT alleges herein that TROJAN is a person under the Act, and that the Facility has discharged pollutants from a point source to navigable waterways, including the San Gabriel River and Pacific Ocean, in violation of the Facility's NPDES Permit.

7. CCAT's review of evidence available to the public reveals a remarkably

consistent pattern of violations since at least January 1, 1993 of the letter and spirit of the Act and Permit.

8.      CCAT and it members are harmed the discharge of stormwater containing excessive levels of lead, which according to TROJAN's own agent presents serious public health threats.  In a May 22, 1996 letter to Stan Boettcher, then-acting Fire Marshall for the City of Santa Fe Springs, Michael Dillon, P.E. states: "[T]here is no debate that the [most] significant health hazard associated with [lead] relates to [its] metabolic assimilation and ultimate retention in various human tissues. For this reason, stringent environmental regulations" are imperative.

9.      CCAT alleges, and demonstrates herein, that TROJAN is a serial polluter.  Data collected, and summarized herein, reveal that TROJAN discharges polluted stormwater from the Facility during every storm event that contains lead and zinc at concentrations that exceed all State and Federal numeric limits and other standards designed to protect human health and the environment. Without the imposition of appropriate civil penalties and issuance of an injunction, TROJAN will continue to violate its NPDES Permit(s) to the further irreparable injury of the plaintiff and public.

## II.      JURISDICTION AND VENUE

10.     This is a civil suit brought under the citizen suit enforcement provisions of the Act.  *See* 33 U.S.C. § 1365.  This Court has subject matter jurisdiction over the parties and this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. §

COMPLAINT

4

1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

11.    On August 15, 2017 CCAT issued a sixty (60) day "Notice of Violation and Intent to File Suit" letter ("Notice Letter") to TROJAN, including its registered agent for service of process, for its violations of both substantive and procedural provisions of the Act and Permit. The Notice Letter informed the Defendants of CCAT's intent to file suit against it to enforce the Act and Permit.

12.    The Notice Letter was also sent to the Attorney General of the United States, the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, the Executive Director of the State Board, and the Executive Officer of the Regional Board, as required by 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R. § 134.2(a)(1). The contents of the Notice Letter are incorporated herein by reference (see EXHIBIT A).

13.    More than 60 days have passed since the Notice Letter was served on TROJAN and relevant State and Federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action is not barred by any prior administrative penalty under

COMPLAINT

section 309(g) of the Act.  33 U.S.C. § 1319(g).

14.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## III.   PARTIES

### A.     California Communities Against Toxics

15.     Plaintiff is a coalition of more than 70 California-based non-profit corporations and community organizations.  CCAT is dedicated to working with communities to advocate for environmental justice and pollution prevention for the benefit of California's human and natural communities.

16.     CCAT has members living in and around Santa Fe Springs and Long Beach, as well as throughout the San Gabriel River watershed. CCAT and its members are harmed by pollution that threatens public health and damages the environment in and around their communities.

17.     The unlawful discharge of pollutants from the Facility into Coyote Creek, the San Gabriel River and Pacific Ocean is a public health threat, and impairs the ability of CCAT's members to use and enjoy these waters.  Thus, the interests of CCAT members have been, are being, and *will continue to* be adversely affected by the Defendant's failure to comply with the Clean Water Act and General Permit.

18.     The relief sought herein will abate ongoing pollution and redress past harms caused by TROJAN'S activities and suffered by Plaintiff.

COMPLAINT

19.    Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff and its members, for which they have no plain, speedy or adequate remedy at law.

**B.    Trojan Battery Company**

20.    TROJAN was founded in 1925 and is among the worlds leading manufacturers of lead-acid batteries, with approximately 850 employees in the United States.  The company is most well known for its design and production of golf cart batteries.  TROJAN'S headquarters are at 12380 Clark St., Santa Fe Spring (90670).

21.    Plaintiff alleges on information and belief that between August 21, 1947 to June 14, 2013, Defendants owned and operated the Facility as a California Corporation named Trojan Battery Company, Inc., with entity identification number C0219738.

22.    Plaintiff alleges on information and belief that on or about June 14, 2013, Defendants Jeffrey Elder and Richard Godber filed form LLC-1A (Limited Liability Company Articles of Organization – Conversion) with the Secretary of State for the State of California to convert the California Corporation to a California-based LLC called Trojan Battery Company, LLC.

23.     Plaintiff alleges on information and belief that on or about June 12, 2013, Defendants' agent David A. Niemeyer (as organizer) formed a Delaware-based LLC called Trojan Battery Holdings, LLC.

24.    Plaintiff alleges on information and belief that on or about June 17, 2013,

Defendants (specifically Richard R. Godber) formed a Delaware-based LLC called Trojan Battery Company, LLC.

25.     Plaintiff alleges on information and belief that on or about June 17, 2013, Defendants converted the California-based LLC to the Delaware-based LLC of the same name.

26.     Plaintiff alleges on information and belief that on or about June 19, 2013, Defendants filed form LLC-5 with the California's Secretary of State to register the Delaware-based Trojan Battery Company, LLC with the State of California.

27.     Plaintiff alleges on information and belief that the form LLC-5 referred to in paragraph 142 was filed and signed by Richard R. Godber as a manager of the Delaware-based Trojan Battery Holdings, LLC, which in turn is the Sole Member of the Delaware-based Trojan Battery Company, LLC.  Thus, the Delaware-based Trojan Battery Holdings, LLC owns and/or otherwise wholly controls the entity operating the Facility in California.

28.     According to a corporate Statement of Information filed by Jeffrey Elder on March 26, 2013 with the Secretary of State for the State of California for entity C0219738, Officers of the corporate entity then owning/operating the Facility included Richard Godber, Jeffrey Elder and John Warren.  Named Directors (who are also officers) of the entity included Richard Godber, David Godber, Suzanne Tomkins and Diane Osborn. The address listed for the principal executive office and principal business office in California in this 2013 filing is 12380 Clark Street, Santa Fe

COMPLAINT

8

Springs, CA 90670.  The address listed for all Officers and Directors in this 2013 filing is 12380 Clark Street, Santa Fe Springs, CA 90670.

29.   According to Restated Articles of Incorporation of Trojan Battery Company filed on August 05, 2011, Richard R. Godber served as Chairman of the Board and Chief Executive Officer, and Jeffrey D. Elder served as President and Assistant Secretary.

30.   Plaintiff alleges on information and belief that on or about December 27, 2013, Defendants (specifically Edward F. Dunlap) filed form LLC-5 with the California's Secretary of State to register the Delaware-based Trojan Battery Holdings, LLC with the State of California.

31.   Plaintiff alleges on information and belief that on or about May 13, 2015 Yvonne Schroeder, in her capacity as Secretary for the Delaware-based Trojan Battery Company, LLC, filed a Statement of Information with the California Secretary of State in which she names Jeff Elder as the company's Chief Executive Officer, as well as the following individuals as members of the Company: Jeff Elder (12380 Clark Street, Santa Fe Springs, CA 90670), Dave Godber (12380 Clark Street, Santa Fe Springs, CA 90670), Richard Godber (23 Inverness Lane, Newport Beach, CA 92660), Brandon White (200 Clarendon Street, Boston, MA 02116), Ryan Carroll (200 Clarendon Street, Boston, MA 02116), Tim Palmer (200 Clarendon Street, Boston, MA 02116), Dennis Sadlowski (2815 Stanford Avenue, Dallas, TX 75225) and Christopher O'Grady (62 Quail Rock Place, The Woodlands, TX 77381).

32.     Plaintiff alleges on information and belief that, on or about May 25, 2017 the Statement of Information filed by Defendants with the Secretary of State for the State of California identifies the following managers: Edward Dunlap (12380 Clark Street, Santa Fe Springs, CA 90670), Jeffrey Elder (12380 Clark Street, Santa Fe Springs, CA 90670) and Yvonne Schroeder (12380 Clark Street, Santa Fe Springs, CA 90670).

33.     Plaintiff is informed and believes, and thereon alleges, that despite the various changes in entity form and locale of entity registration, TROJAN (and/or its predecessors for which TROJAN is liable) is the owner and operator of the Facility; and therefore TROJAN is the legal person responsible for any violations of the Permit and Act at the Facility.

34.     Plaintiff alleges on information and belief that Southern California investor David Horowitz owns the property on which TROJAN conducts its industrial activities in Santa Fe Springs.

35.     TROJAN owns two industrial facilities in Georgia that are similar to the Facility. In June and July 2017, Ismael Pedroza filed NOIs for the two facilities, re-enrolling them in Georgia's NPDES stormwater permit program for discharges into Robinson Creek and Panther's Branch of the Ocmulgee River Basin. The Georgia NOIs categorize industrial activities at those facilities under two Primary SIC Codes: 3691 (Storage Batteries) and 3341 (Secondary Nonferrous Metals).

36.     Upon information and belief, Plaintiff alleges that the true names, or

COMPLAINT

capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to Plaintiff, who therefore sue said Defendants by such fictitious names.  Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained.  Whether or not TROJAN is associated with any other individual, corporate, associate or otherwise was not immediately apparent through CCAT's initial investigation.

37.    DOES 1 through 10 are included, where appropriate in context, in any reference to Defendant or Defendants in this Complaint.

## IV.   FACTUAL BACKGROUND.

### A.    The Facility's Permit Coverage.

38.    TROJAN filed a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated With Industrial Activities ("NOI") for the Facility with the State Board on March 31, 1992. ("1992 NOI").

39.    TROJAN filed a second NOI on March 19, 1998 ("1998 NOI").

40.    In 2013, Ismael Pedroza filed a Notice of Termination ("2013 NOT") due to a change in the form of ownership and/or location of entity registration.

41.    Following the 2013 NOT, a third NOI was filed with the Regional Board on June 21, 2013 ("2013 NOI").

42.    A forth NOI was filed by Ismael Pedroza for the Facility on July 16, 2015 ("2015 NOI") in order to recertify TROJAN's intent to comply with the Permit upon the transition from the 1997 Permit to the 2015 Permit.

COMPLAINT

43.     Plaintiff alleges on information and belief that each of the various NOI's submitted to the Regional Board list the operator of the Facility as "Trojan Battery Company."

44.     Plaintiff alleges on information and belief that the Facility operated under Waster Discharge Identification ("WDID") number 4 19I002500 for the period between filing the 1992 NOI and the 2013 NOI.  SMARTS lists the status of WDID number 4 19I002500 as "Terminated."

45.     Plaintiff alleges on information and belief that since filing the 2013 NOI, TROJAN operated the Facility under WDID number 4 19I024325.  SMARTS lists the status of WDID number 4 19I024325 as "Active."

46.     Plaintiff alleges on information and belief that the Facility has been, notwithstanding changes in TROJAN's registrations and legal/tax structure, continuously under Defendant's control and ownership, and subject to requirements of the Permit since filing the 1992 NOI.

**B.      The Facility's Site Description**

47.     Plaintiff alleges on information and belief that the Facility is located near one elementary school, two high schools and at least one public park.

48.     Plaintiff alleges on information and belief that the Facility is engaged in the production and assembly of lead-acid batteries.

49.     Industrial processes associated with the production and assembly of lead-acid batteries includes melting of lead, producing lead oxide, pasting, and grid and

COMPLAINT
12

plate production.

50.    On information and belief, Plaintiff alleges that as of 2013 the Facility processes approximately 120,000 lbs. of lead each month.

51.    On information and belief, Plaintiff alleges that the Facility produces, stores and uses lead oxide, which is a toxic dust that measures 4 microns.

52.    Plaintiff alleges on information and belief that the Facility stores substantial quantities of raw materials, including lead, and waste products, including hazardous waste, outdoors and without adequate cover.

53.    According to information and belief, the Facility is subject to regulation by the South Coast Air Quality Management District ("Air District") under Rule 1420.2 – Emissions Standards for Lead from Metal Melting Facilities, which applies to facilities that have an estimated annual lead ("Pb") throughput of greater than 100 tons.

54.    On February 1, 2018 the Air District issued an Order of Abatement to TROJAN for violating the terms of Rule 1420.2 by emitting levels of lead into the air that threaten public health and welfare.  The Air District's Order of Abatement specifically cited "outdoor storage of lead bars, lead-containing sludge at an on-site wastewater treatment system and exhaust from burners that melt lead" as the likely sources of this pollution.

55.    According to information and belief, Plaintiff alleges that the Facility holds an Industrial Wastewater Discharge Permit ("Wastewater Permit") issued by the

COMPLAINT
13

County Sanitation Districts of Los Angeles County ("Sanitation District").

56.     The Facility's Wastewater Permit number is 003673.  The most recent renewal was issued by the Sanitation District on October 2, 2015 and will expire on October 1, 2020.  Section 3 of his Wastewater Permit describes the Flow Stream Information as "Casting quench, pasting pit," "Equipment and floor washdown," and "Mold release formation."  Section 7 of this Wastewater Permit describes the Flow Limits, including a Daily Average Flow Limit of 1000 Gallons Per Day, and 5-minute Peak Flow Limit of 5 Gallons Per Minute.

57.     The Facility's Wastewater Permit incorporates Section 305 of the Sanitation District's Wastewater Ordinance, which prohibits the discharge of any rainwater or stormwater to facilities owned by the District, except where prior approval for such discharge is given by the Chief Engineer.

58.     On information and belief, the Facility has not been granted a waiver, variance or similar exclusion from Section 305's prohibition, and has not had any approval from the Chief Engineer to discharge rainwater or stormwater into the sanitary sewer during at least the last 5 years.

59.     On information and belief, Plaintiff alleges that TROJAN has violated the terms of its wastewater permit by discharging stormwater into the sanitary sewer.

/ /

/ /

/ /

COMPLAINT

14

## C. Facility's Storm Water Pollution Prevention Plans

60.    CCAT reviewed a total of 4 Storm Water Pollution Prevention Plans[1] ("SWPPPs") for the Facility in preparing its 60-day Notice Letter.  Each of the 4 SWPPPs is a revision to a SWPPP originally prepared/issued by TROJAN on August 31, 1999.  The original SWPPP is not publicly available.

61.    The four (4) SWPPP are Revision I dated May 11, 2010 ("2010 SWPPP"), Revision J dated June 29, 2015 ("2015 SWPPP"), Revision K dated December 19, 2016 ("2016 SWPPP"), and Revision L dated August 2, 2017 ("August 2017 SWPPP").  At the time CCAT served TROJAN, the August 2017 SWPPP was the current SWPPP.

62.    Nearly 60 days after CCAT served its 60-day Notice Letter, TROJAN completely a wholly revised SWPPP, dated September 2017 ("September 2017 SWPPP").  The September 2017 SWPPP became the current SWPPP on October 6, 2017 when TROJAN uploaded the document to the Regional Board's database for electronic submissions of compliance documents.

## D. The Facility's Receiving Waters

63.    The 1992 NOI identifies the storm drain system to which the Facility discharges as being owned by the Los Angeles County of Public Works, and the closest Receiving Water as Coyote Creek.

---

[1] For a detailed recitation of the law regarding SWPPPs, see paragraph 296 through 307 *infra*.
[2] For a detailed recitation of the law regarding BCT, BAT and BMPs, see paragraph 249 through 257 *infra*.
[3] For a detailed recitation of the law regarding EPA Benchmarks, see paragraph 245 *infra*.

64.    The 2015 NOI lists the Facility's Receiving Waters as San Gabriel Basin.

65.    The 2016 SWPPP lists Coyote Creek and Reach 2 of the San Gabriel River as the Facility's Receiving Waters.

66.    The Facility's September SWPPP 2017 identifies Coyote Creek, San Gabriel River Reach 1 and 2, and Artesia-Norwalk Drain as the Receiving Waters.

67.    CCAT is informed and believes, and thereon alleges, that each of TROJAN's NOIs and SWPPPs have failed to identify additional Receiving Waters, including the San Gabriel River Estuary, the San Pedro Bay and the Pacific Ocean.

68.    CCAT is informed and believes, and thereon alleges, that each of the Receiving Waters is a water of the United States.

69.    CCAT is informed and believes, and thereon alleges, that polluted stormwater and non-storm water from the Facility is discharged to the Receiving Waters.

**E.    The Facility's Discharge Points**

70.    Plaintiff is informed and believes, and thereon alleges, that the pollutants associated with the Facility's industrial activity have been and continue to be tracked throughout the Facility, including by forklift traffic and aerial deposition.

71.    The September 2017 SWPPP indicates that the Facility has a single discharge point.

72.    A site map for the Facility submitted to the Regional Board and dated March 27, 1992 identifies two (2) discharge points.

COMPLAINT

16

73.    CCAT is informed and believes, and thereon alleges, that the September 2017 SWPPP fails to identify and describe all discharge points.

74.    Plaintiff is informed and believes, and thereon alleges, that TROJAN has not collected stormwater samples from all points where storm water discharges associated with industrial activity are discharged.  These points include, but are not limited to, the additional discharge point identified in the 1992 Site Map.

**F.    Industrial Activities, Pollutant Sources, Pollutants & BMPs**

75.    Plaintiff is informed and believes, and thereon alleges, that the Facility's industrial activities and areas of industrial activity are potential pollutant sources.

76.    Plaintiff is informed and believes, and thereon alleges, that sources of pollutants at the Facility include, but are not limited to: lead melting, lead oxide production and transfer, metal grinding, hazardous waste management and storage, wastewater treatment, raw material storage, lead oxide storage silos, forklift traffic, and chemical use and storage.

77.    Plaintiff is informed and believes, and thereon alleges, that the Facility's air emissions reduction equipment is a source of stormwater pollution, including through aerial deposition onto the entire Facility (depending on wind direction and strength).

78.    Plaintiff is informed and believes that fugitive emissions, i.e. those particulate and other emissions that do not pass completely through the Facility's air emissions reduction equipment, result the aerial deposition of various pollutants

throughout the property, including the parking lot on the northwest side.

79.    Plaintiff is informed and believes, and thereon alleges, that past and current SWPPPs prepared by TROJAN for the Facility have failed and continue to fail to adequately describe pollutants sources and pollutants at the Facility.

80.    Plaintiff is informed and believes, and thereon alleges, that TROJAN has failed and continues to fail to adequately assess the Facility's potential pollutant sources, and to identify potential pollutants.

81.    Plaintiff is informed and believes, and thereon alleges, that TROJAN has failed and continues to fail to adequately assess pollutants associated with potential pollutant sources at the Facility.

82.    Plaintiff is informed and believes, and thereon alleges, that without adequately assessing pollutant sources and identifying potential pollutants, TROJAN has not *developed or implemented* adequate pollution control strategies, referred to in the Permit as Best Management Practices ("BMPs") to prevent or reduce pollutants discharges in the Facility's stormwater consistent with the Act and Permit, which require permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.[2]  40 C.F.R. §§ 401.15-16;

---

[2] For a detailed recitation of the law regarding BCT, BAT and BMPs, see paragraph 249 through 257 *infra*.

COMPLAINT

18

1997 Permit, Section B(3); 2015 Permit, Section V(A).

83.    The BCT and BAT technology-based standards are enforceable through (i.e. incorporated into) the Permit via a requirement to develop and implement BMPs that achieve pollutant reductions consistent with the standards.

84.    Plaintiff is informed and believes, and thereon alleges, that pollutants associated with the Facility, and for which all stormwater samples collected must be analyzed, include but are not limited to Total Suspended Solids ("TSS"), pH, oil and grease ("O&G"), Chemical Oxygen Demand ("COD"), aluminum ("Al"), iron ("Fe"), zinc ("Zn"), nickel ("Ni"), magnesium ("Mg"), copper ("Cu"), lead ("Pb"), chromium ("Cr"), antimony and arsenic.

85.    Plaintiff is informed and believes, and thereon alleges, that industrial activities occur throughout the Facility without adequate exposure minimization BMPs to prevent contact between storm water and pollutants.  Most specifically, TROJAN has failed to describe or implement adequate exposure minimization BMPs for lead and lead-containing materials that are stored outdoors.  At present, TROJAN's primary exposure minimization BMP is to tarp outdoor materials.  Tarps do not constitute BAT for a lead.

86.    Plaintiff is informed and believes, and thereon alleges, that the September 2017 SWPPP fails to include an adequate description of the Facility's BMPs.

87.    Plaintiff is informed and believes, and thereon alleges, that the

COMPLAINT

September 2017 SWPPP fails to *describe* adequate BMPs to reduce or prevent pollutants in the Facility's storm water.

88.     Plaintiff is informed and believes, and thereon alleges, that TROJAN has failed and will continue to fail to *implement* adequate BMPs at the Facility to reduce or prevent pollutants in storm water.

89.     Plaintiff is informed and believes, and thereon alleges, that many of the BMPs proposed in the September 2017 SWPPP have been proposed—and presumably implemented—since *at least* 2010.

90.     Plaintiff is informed and believes, and thereon alleges, that the September 2017 SWPPP does not include an adequate analysis of the effectiveness of proposed BMPs.

91.     Plaintiff is informed and believes, and thereon alleges, that stormwater sampling at the Facility demonstrates that its stormwater discharges contain concentrations of pollutants that exceed numeric limits set by U.S. EPA ("Benchmarks") as thresholds for the protection of aquatic life.[3]  (*See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); *see also* MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).)

92.     TROJAN's certified compliance documents establish exceedances of Benchmarks for, *inter alia*, lead, zinc and TSS.

---

[3] For a detailed recitation of the law regarding EPA Benchmarks, see paragraph 245 *infra*.

COMPLAINT

93.    Plaintiff is informed and believes, and thereon alleges, that repeated and significant exceedances of Benchmark limits demonstrate that TROJAN has failed and continues to fail *to develop* BMPs to prevent the exposure of pollutants to stormwater, and to prevent the discharge of polluted stormwater from the Facility.

94.    Plaintiff is informed and believes, and thereon alleges, that repeated and significant exceedances of Benchmarks demonstrate that TROJAN has failed and continues to fail *to implement* BMPs to prevent the exposure of pollutants to stormwater, and to prevent the discharge of dangerously polluted stormwater from the Facility.

### G.    1992 to 2013: Pattern of Highly Polluted Discharges Indicate Disregard for Public Health and the Environmental

95.    As detailed in TABLE 1 below, stormwater data submitted by TROJAN to the State of California between 1992 and 2013 establishes two patterns.  First, TROJAN discharged stormwater contaminated with excessive lead concentrations during every storm event it sampled over the 20+ year period by an average of more than 6,000% of the Benchmark (0.0816 mg/L).  The second pattern found in Table 1 is that TROJAN failed to take corrective action over decades despite indisputable evidence of a continuous failure to design/implement effective BMPs.

TABLE 1
1992-2013 Stormwater Pollution Data As Certified by Defendant

| Permit Term | Sample Date | Pb Concentration | Percent Benchmark Exceedance | Data Source |
|---|---|---|---|---|
| 1992-1993* | 01.06.93 | 7.0 mg/L | ~8500% | Certified 1992-93 Annual Report at p. 5 (EXHIBIT B) |
| 1993-1994 | 12.11.93 | 5.5 mg/L | ~6700% | Certified 1993-94 Annual Report |

| | | 02.04.94 | 1.1 mg/L | ~1300% | p. Item 10-A (EXHIBIT C) |
|---|---|---|---|---|---|
| | 1999-2000* | 01.25.00 | 5.2 mg/L | ~6300% | Certified 1999-2000 Annual Report Form 1 (EXHIBIT D) |
| | | 04.17.00 | 4.6 mg/L | ~5600% | |
| | 2000-2001* | 01.12.01 | 5.94 mg/L | ~7200% | Certified 2000-01 Annual Report Form 1 (EXHIBIT E) |
| | | 01.24.01 | 0.99 mg/L | ~1200% | |
| | 2001-2002 | 11.29.01 | <1 mg/L | Unknown | Certified 2001-02 Annual Report Form 1 (EXHIBIT F) |
| | | 04.24.02 | 1.6 mg/L | ~1900% | |
| | 2002-2003 | 11.08.02 | 1.06 mg/L | ~1200% | Certified 2002-03 Annual Report Form 1 (EXHIBIT G) |
| | | 12.16.02 | 4.7 mg/L | ~5600% | |
| | | 02.11.03 | 15 mg/L | ~18,000% | |
| | | 04.14.03 | 38.6 mg/L | ~46,000% | |
| | 2003-2004* | 01.02.04 | 6.2 mg/L | ~7400% | Certified 2003-04 Annual Report Form 1 (EXHIBIT H) |
| | | 02.02.04 | not tested | n/a | |
| | 2004-2005 | 10.20.04 | 2.1 mg/L | ~2400% | Certified 2004-05 Annual Report Form 1 (EXHIBIT I) |
| | | 12.28.04 | 14 mg/L | ~17,000% | |
| | | 02.11.05 | 2.0 mg/L | ~2400% | |
| | 2005-2006* | 02.27.06 | 1.6 mg/L | ~1900% | Certified 2005-06 Annual Report Form 1 (EXHIBIT J) |
| | | 03.03.06 | not tested | n/a | |
| | 2006-2007* | 02.19.07 | 13.6 mg/L | ~15,700% | Certified 2006-07 Annual Report Form 1 (EXHIBIT K) |
| | | 04.20.07 | 10.5 mg/L | ~12,700% | |
| | 2007-2008 | 11.30.07 | 2.3 mg/L | ~2700% | Certified 2007-08 Annual Report Form 1 (EXHIBIT L) |
| | | 12.18.07 | 3.5 mg/L | ~4100% | |
| | 2008-2009 | 11.04.07 | 1.9 mg/L | ~2200% | Certified 2008-09 Annual Report Form 1 (EXHIBIT M) |
| | | 12.15.07 | 0.69 mg/L | ~741% | |
| | 2009-2010 | No AR on file | 3.1 mg/L | ~3600% | Regional Board's Notice of Violation Letter (10.01.13) at p. 2 (EXHIBIT N) |
| | | | 4.6 mg/L | ~5600% | |
| | 2010-2011 | 10.04.10 | 1.3 mg/L | ~1500% | Certified 2010-11 Annual Report Form 1 (EXHIBIT O) |
| | | 12.12.10 | 2.3 mg/L | ~2700% | |
| | 2011-2012 | 10.05.11 | 4.4 mg/L | ~5500% | 2011-12 Lab Reports (EXHIBIT P) |
| | | 12.10.11 | 3.7 mg/L | ~4200% | |
| | 2012-2013 | 11.30.12 | 0.16 mg/L | ~95% | 2012.11.30 Lab Report (EXHIBIT Q) |
| | | 01.24.13 | 1.2 mg/L | ~1300% | 2013.01.24 Lab Report (EXHIBIT R) |

\* - indicates Permit Term during which TROJAN failed to collect samples during *at least* the first half of the winter.

96.    On April 23, 2010 the Regional Board sent via certified mail an informal enforcement letter (EXHIBIT S "2010 Benchmark Exceedance Letter") detailing exceedances of Benchmarks for lead and zinc in samples collected by TROJAN on November 4 and December 15, 2008.

97.    The 2010 Benchmark Exceedance Letter suggests that "[e]xceeding benchmark levels in sampling results is mainly due to ineffective BMPs," and reminds

COMPLAINT

TROJAN that "Permit Section A.8 […] requires the permittee to develop and implement the BMPs to reduce or prevent pollutants in storm water discharges." (*See* EXHIBIT S)

98.    The 2010 Benchmark Exceedance Letter informs TROJAN that in order to bring itself into compliance with Permit, it must complete the following tasks:

"1. Ensure full compliance with the General Permit (Section A.8).
2. Implement effective BMPs described in your SWPPP, or;
3. If you are already implementing the BMPs described in your SWPPP but your analytical results are higher than the benchmark values, you must implement additional BMPs, and amend your SWPPP accordingly." (see EXHIBIT S)

99.    The 2010 Benchmark Exceedance Letter concludes by informing TROJAN that "[i]f you fail to implement or upgrade you BMPs and amend your SWPPP […] you are subject to enforcement action, including administrative civil liability (penalties), for your violation(s) of the General Permit." (*See* EXHIBIT S)

100.    TROJAN responded to the 2010 Benchmark Exceedance Letter with a letter (and an attached SWPPP revision) on May 21, 2010 (EXHIBIT T "2010 Trojan Response").  TROJAN's response concludes with the following statement: "I am confident with the implementation of our new BMP's and the revision of our SWPPP Trojan will be aligned with the benchmark values in the General Permit for Storm Water Discharge."

101.    Data submitted by TROJAN for its next four stormwater samples verify Benchmark exceedances for lead by 1500%, 2700%, 5500% and 4200%. (*See*

COMPLAINT                                          23

EXHIBITS T N, O and P)

**H.   1992 to 2013: Repeated Failures to Complete Remedial Action Indicates Disregard for Public Health and the Environment**

102.   Frank Tomkins, Jr. and Richard Godber, who filed TROJAN's Annual Reports for 1992-93 (EXHIBIT B) and 1993-94 (EXHIBIT C) respectively, unequivocally reject the need to undertake any evaluation of the Facility's efforts to design *and implement* BMPs to prevent or reduce pollutants in stormwater discharges.  Mr. Tomkins and Mr. Godber's rejections come in spite of sampling data that decidedly demonstrates fundamental faults in the Facility's pollution control strategies.

103.   On December 5, 1996 the Santa Fe Springs Fire Marshall sent a letter to TROJAN's VP of Operations Rick Godber regarding a major spill/release of lead at the Facility on September 9, 1996.  (*See* EXHIBIT U) The City's letter describes TROJAN as "derelict" and "negligent," and "[b]ecause of Trojan's gross inability to respond in a responsible manner to the incident and the sever consequences that could result" it was being fined $50,000 for "lead releases."

104.   An inspection report by the ICC in 1998 describes "poor housekeeping practices" that left the agency with "an unfavorable impression with regard to the safety of operations."  The report concludes that TROJAN's "casual concern" left the agency with a "poor impression with regard to Trojan's level of concern about preventing unauthorized releases of hazardous materials." (*See* EXHIBIT V)

<u>1999-2000 Permit Compliance Reports Submitted to State of California</u>

105.   The Facility's 1999-2000 Annual Report (EXHIBIT D) was certified by TROJAN'S Safety & Environmental Affairs Director on June 14, 2000.

106.   The Facility's 1999-2000 Annual Report includes Form 4 ("Form 4/Observations 2000"), which is designed for tracking and reporting the Facility's Monthly Visual Observations of Storm Water Discharges.

107.   Generically, Form 4 requires permittees to do complete a table with columns for the following 3 observations regarding each date/time observed at each discharge point: 1) describe the characteristics of the discharge water; 2) identify/describe the sources of the pollutants; and 3) describe any revised or new BMPs (including date of planned implementation).  Form 4 is functionally identical to TABLE 2 below.

TABLE 2
Reproduction of Permit Form 4
Monthly Visual Observations of Storm Water Discharges

| DATE/TIME OF OBSERVATION | DRAINAGE AREA DESCRIPTION | DESCRIBE STORM WATER DISCHARGE CHARACTERISTICS | IDENTIFY AND DESCRIBE SOURCE(S) OF POLLUTANTS | DESCRIBE ANY REVISED OR NEW BMPS AND THEIR DATE OF IMPLEMENTATION |
|---|---|---|---|---|

108.   TROJAN's Form 4/Observations 2000 includes complete entries for discharges on November 8, 1999 and January 25, 2000 from the Ann St. South driveway.  TROJAN's Form 4/Observations 2000 describes the discharge water's characteristics as "oil and grease sheen," "turbidity – cloudinesss."  TROJAN identifies the sources of these pollutants as "material handling" and "environmental

dust." TROJAN's Form 4/Observations 2000 proposed solutions include a "quarterly pressure wash of the yard and weekly floor scrub of yard, [implemented by] 1/00."

109.   The Facility's 1999-2000 Annual Report (EXHIBIT D) included the Annual Comprehensive Site Compliance Evaluation and Potential Pollutant Source/Industrial Activity BMP Status at Form 5 ("Form 5/Evaluation 2000").

110.   Generically, Form 5 is the portion of the Annual Report where permittees are expected to evaluate the overall effectiveness of existing pollution control strategies and propose revisions to a facility's SWPPP.  Specifically, Form 5 provides a table with 4 columns for substantive reporting, as reproduced in TABLE 3.

TABLE 3
Reproduction of Permit Form 5:
Annual Comprehensive Site Compliance Evaluation
Potential Pollutant Source/Industrial Activity BMP Status

| POTENTIAL POLLUTANT SOURCE/INDUSTRIAL ACTIVITY AREA | HAVE ANY BMPs NOT BEEN FULLY IMPLEMENTED? ARE ADDITIONAL/REVISED BMPs NECESSARY? | If yes to either question, complete the next two columns of this form | DESCRIBE DEFICIENCIES IN BMPs OR BMP IMPLEMENTATION | DESCRIBE ADDITIONAL/REVISED BMPs OR CORRECTIVE ACTIONS AND THEIR DATE(S) OF IMPLEMENTATION |
|---|---|---|---|---|

111.   The Facility's Form 5/Evaluation 2000 assessed a variety of revised or new BMPs, including: i) the need to institute an outside yard cleaning program (including use of a street sweeper on a regular basis), ii) the designation of different forklifts for inside and outside travel, iii) installing roofs over raw material storage outdoors, iv) avoiding the storage of lead-containing materials near the stormwater runoff pipe, and v) studying the feasibility of directing the first 2 hours of stormwater

to the water treatment systems, then "opening the valves to direct water to stormdrain." *See* EXHIBIT D.

112.    Form 5/Evaluation 2000 concludes that it is infeasible to direct the most polluted water of each storm to the water treatment systems because the system lacks sufficient capacity.

2000-2001 Permit Compliance Reports Submitted to State of California

113.    The Facility's 2000-2001 Annual Report (EXHIBIT E) was certified by TROJAN'S Safety & Environmental Affairs Director on June 27, 2001.

114.    The Facility's 2000-2001 Annual Report includes Form 4 for recording the Facility's Monthly Visual Observations of Storm Water Discharges ("Form 4/Observations 2001").

115.    Form 4/Observations 2001 includes entries of visual observations of stormwater discharges completed by Ismael Pedroza on October 11, 2000 and May 24, 2001 at Ann Street South Driveway and "Storm Water Outfall," respectively.

116.    In Form 4/Observations 2001 Mr. Pedroza describes the characteristics of the discharges as including "floating/suspended debris" and "oil sheen" for both dates.

117.    In Form 4/Observations 2001 Mr. Pedroza identified the source of pollutants as "pieces of wood pallets and paper" and "oil from vehicles in the parking lot and forklift traffic" for both dates.

118.    In Form 4/Observations 2001 Mr. Pedroza's proposed remedy is "Material handling techniques training[, implemented by] 10/01."

COMPLAINT

119.    The Facility's 2000-2001 Annual Report includes Form 5 Comprehensive Annual Evaluation and BMP revision section ("Form 5/Evaluation 2001").

120.    Form 5/Evaluation 2001 identifies 11 potential pollutant sources/industrial activity areas, which include "Forklift traffic inside and outside plant," "storm water runoff,"  "raw material and empty drum storage," and "industrial processes and manufacturing activities."

121.    Form 5/Evaluation 2001 indicates that all BMPs have been fully implemented and that not additional/revised BMPs are necessary for the 11 identified pollutant sources, including for "material storage," "raw material and empty drum storage" and industrial/manufacturing activities.

122.    At Form 5/Evaluation 2001, TROJAN does not describe any BPM deficiencies or propose any additional/new BMPs for 6 pollutant sources.

123.    Form 5/Evaluation 2001 describes the deficiency for forklift traffic in/out of the plant as "lead dust [that] accumulates on the forklifts that travel in and out of the plant."

124.    Form 5/Evaluation 2001 further describes the potential "of running most of storm water through the waste water system."  Form 5/Evaluation 2001 concluded, however, that the option is again deemed "[n]ot feasible at this time due to limited capacity of water treatment system."  *See* EXHIBIT E.

## 2001-2002 Storm Water Permit Compliance Reports

125.   The Facility's 2001-2002 Annual Report (EXHIBIT F) was certified by TROJAN's Safety and Environmental Affairs Director on June 19, 2002.

126.   The Facility's 2001-2002 Annual Report includes Form 4 for recording the Facility's Monthly Visual Observations of Storm Water Discharges ("Form 4/Observations 2002").

127.   Form 4/Observations 2002 includes notes from Ismael Pedroza's for 3 observation dates: November 29, 2001 at 11:38 am of a discharge that began at 10:38 am; December 20, 2001 at 8:30 am of a discharge that began at 7:30 am; and April 24, 2002 at 8:00 am for a discharge that began at 7:00 am.

128.   TROJAN'S responses for Form 4/Observations 2002 are faithfully reproduced in TABLE 4.  (*See* EXHIBIT F)

TABLE 4
### Defendant's Form 4/Observations 2002

| DATE/TIME OF OBSERVATION | DRAINAGE AREA DESCRIPTION | DESCRIBE STORM WATER DISCHARGE CHARACTERISTICS | IDENTIFY AND DESCRIBE SOURCE(S) OF POLLUTANTS | DESCRIBE ANY REVISED OR NEW BMPS AND THEIR DATE OF IMPLEMENTATION |
|---|---|---|---|---|
| 11/29/01 | Ann Street South Driveway | 1. floating debris 2. very light sheen – oil | 1. pieces of wood pallets and paper 2. oil from vehicles in front parking lot and forklift traffic | Materials handling training 6/02 |
| 12/20/01 | Ann Street South Driveway | 1. floating debris 2. very light sheen – oil | 1. pieces of wood pallets and paper 2. oil from vehicles in front parking lot and forklift traffic | Materials handling training 6/02 |
| 4/24/02 | Ann Street South Driveway | 1. floating debris 2. very light sheen – oil and grease | 1. pieces of wood pallets and paper 2. oil from vehicles in front parking lot and forklift traffic | Materials handling training 6/02 |

129.   The Facility's 2001-2002 Annual Report includes Form 5 ("Form 5/Evaluation 2002"), on which Ismael Pedroza again identifies 11 potential pollutant sources/industrial activity areas.

130.   Form 5/Evaluation 2002 indicates that all BMPs have been fully implemented for every pollutant source/industrial area, that no additional/revised BMPs are necessary.

131.   Form 5/Evaluation 2002 does, however, describe a deficiency at the Facility: "lead dust accumulates on the forklifts that travel in and out of the plant."

132.   During the 2000-2001 Permit Term, TROJAN analyzed stormwater samples for arsenic, cadmium, chromium, copper, lead, nickel, silver and zinc.

<u>2002-2003 Storm Water Permit Compliance Reports</u>

133.   The Facility's 2002-03 Annual Report (ATTACHMENT F) is certified by TROJAN's Safety and Environmental Affairs Director on June 19, 2003.

134.   TROJAN'S 2002-03 Annual Report includes Form 4 for recording the Facility's Monthly Visual Observations of Storm Water Discharges ("Form 4/Observations 2003").

135.   Form 4/Observations 2003 includes notes for 5 dates, which are faithfully reproduced at TABLE 5.

/ /

/ /

/ /

COMPLAINT

TABLE 5
Defendant's Form 4/Observations 2003

| DATE/TIME OF OBSERVATION | DRAINAGE AREA DESCRIPTION | DESCRIBE STORM WATER DISCHARGE CHARACTERISTICS | IDENTIFY AND DESCRIBE SOURCE(S) OF POLLUTANTS | DESCRIBE ANY REVISED OR NEW BMPS AND THEIR DATE OF IMPLEMENTATION |
|---|---|---|---|---|
| 11/08/02 | Ann Street South Driveway | 1. floating debris 2. very light sheen – oil | 1. pieces of wood pallets and paper 2. oil from vehicles in front parking lot and forklift traffic | Materials handling techniques training 6/03 |
| 12/16/02 | Ann Street South Driveway | 1. floating debris 2. very light sheen – oil | 1. pieces of wood pallets and paper 2. oil from vehicles in front parking lot and forklift traffic | Materials handling techniques training 6/03 |
| 02/11/03 | Ann Street South Driveway | 1. floating debris 2. very light sheen – oil | 1. pieces of wood pallets and paper 2. oil from vehicles in front parking lot and forklift traffic | Materials handling techniques training 6/03 |
| 03/20/03 | Ann Street South Driveway | 1. floating debris 2. very light sheen – oil | 1. pieces of wood pallets and paper 2. oil from vehicles in front parking lot and forklift traffic | Materials handling techniques training 6/03 |
| 04/14/03 | Ann Street South Driveway | 1. floating debris 2. very light sheen – oil | 1. pieces of wood pallets and paper 2. oil from vehicles in front parking lot and forklift traffic | Materials handling techniques training 6/03 |

136.    The Facility's 2002-2003 Annual Report includes Form 5 ("Form 5/Evaluation 2003"), on which Ismael Pedroza identifies 14 potential pollutant sources/industrial activity areas.

137.    Form 5/Evaluation 2003 indicates that all BMPs have been fully implemented and that no additional/revised BMPs are necessary for 12 of the 14 identified pollutant source/industrial areas.

138.    Form 5/Evaluation 2003 includes a note regarding the fact that "lead dust accumulates on the undercarriage of the forklifts which travels in and out of the plant." Form 5/Evaluation 2003 proposes no corrective action for this repeated

deficiency.

139.   Form 5/Evaluation 2003 identifies two potential solutions, both of which were identified/described in prior annual compliance evaluations, including "[l]ooking into acuminating and processing 3 hours of storm water and then sampling," and "cleaning of the yard on a bi-monthly basis."

140.   Form 5/Evaluation 2003 places responsibility for high lead concentrations in stormwater on two different contractors, both of which left material and unclean drums in the yard uncovered.

141.   TROJAN's first stormwater sample after implementation of the bi-monthly yard cleanups described in paragraph 139 above, was collected was on January 2, 2004, i.e. after approximately 7 months and 14 yard cleanups.  That sample contained a lead concentration of 6.2 mg/L, or more than 7000% of the Benchmark.

142.   Plaintiff alleges that either the BMPs added by Ismael Pedroza (and described in paragraph 139) were inadequately designed and/or inadequately implemented.  In either event, TROJAN'S failings violate the Permit and Act.

143.   The sample collected on February 2, 2004 was not tested for lead.

2003-2004 Storm Water Permit Compliance Reports

144.   The Facility's 2003-04 Annual Report (EXHIBIT H) is certified by TROJAN's Safety and Environmental Manager Ishmael Pedroza on June 24, 2004.

145.   TROJAN's 2003-04 Annual Report includes Form 4 for recording the Facility's Monthly Visual Observations of Storm Water Discharges ("Form

4/Observations 2004").

146.    Form 4/Observations 2004 includes notes for 2 dates, which are faithfully reproduced at TABLE 6.

TABLE 6
Defendant's Form 4/Observations 2004

| DATE/TIME OF OBSERVATION | DRAINAGE AREA DESCRIPTION | DESCRIBE STORM WATER DISCHARGE CHARACTERISTICS | IDENTIFY AND DESCRIBE SOURCE(S) OF POLLUTANTS | DESCRIBE ANY REVISED OR NEW BMPs AND THEIR DATE OF IMPLEMENTATION |
|---|---|---|---|---|
| 01/03/04 | Storm water Outfall | 1. floating debris 2. turbidity | 1. pieces of paper, wood pallet and dirt 2. Environmental dust/dirt | Materials Handling techniques training 7/04 |
| 02/02/04 | Storm water Outfall | 1. floating debris 2. turbidity | 1. pieces of paper, wood pallet and dirt 2. Environmental dust/dirt | Materials Handling techniques training 7/04 |

147.    The Facility's 2003-2004 Annual Report includes Form 5 ("Form 5/Evaluation 2004"), on which Ismael Pedroza identifies 14 potential pollutant sources/industrial activity areas.

148.    Form 5/Evaluation 2004 indicates that for 13 of the 14 sources/activities identified, all BMPs have been fully implemented and no additional/revised BMPs are necessary.

149.    The one source/activity that TROJAN flags as requiring additional/ revised BMPs is "Housekeeping and sweeping inside/outside the plan."

150.    For this source/activity Form 5/Evaluation 2004 describes the deficiency as "1. Housekeeping program in place." In the appropriate box, Ismael Pedroza describes two additional/revised BMPS: "1. The yard is washed down on quarter and the water is treated through our wastewater system. 2. The yard is swept one a week

by a sweeping company."

151.   Sampling data submitted by TROJAN to the State of California report that lead concentrations on October 20, 2004 and February 11, 2005 (i.e. after the three BMPs described in paragraph 150 were to have been implemented) contained lead concentrations of 14 mg/L (~17,000% of the Benchmark) and 2 mg/L (~2400% of the Benchmark), respectively.

152.   Plaintiff alleges that either the BMPs added by Ismael Pedroza (and described in paragraph 150) were inadequately designed and/or inadequately implemented.  In either event, TROJAN'S failings violate the Permit and Act.

2004-2005 Storm Water Permit Compliance Reports

153.   TROJAN'S Safety and Environmental Manager Ismael Pedroza certified the Facility's 2004-05 Annual Report (EXIBIT I) on June 24, 2005.

154.   TROJAN's 2004-05 Annual Report includes Form 4 for recording the Facility's Monthly Visual Observations of Storm Water Discharges ("Form 4/Observations 2005").

155.    Form 4/Observations 2005 includes notes detailing observations of stormwater discharges on October 20 and November 28, 2004, and January 28, February 11 and April 28 2005, which are faithfully reproduced at TABLE 7.

//

//

//

COMPLAINT

TABLE 7
Defendant's Form 4/Observations 2005

| DATE/TIME OF OBSERVATION | DRAINAGE AREA DESCRIPTION | DESCRIBE STORM WATER DISCHARGE CHARACTERISTICS | IDENTIFY AND DESCRIBE SOURCE(S) OF POLLUTANTS | DESCRIBE ANY REVISED OR NEW BMPs AND THEIR DATE OF IMPLEMENTATION |
|---|---|---|---|---|
| 10/20/04 | Storm water Outfall | 1. floating debris 2. turbidity | 1. pieces of paper, wood pallet and dirt 2. Environmental dust/dirt | Materials handling training 7/05 |
| 11/28/04 | Storm water Outfall | 1. floating debris 2. turbidity | 1. pieces of paper, wood pallet and dirt 2. Environmental dust/dirt | Materials handling training 7/05 |
| 12/28/04 | Storm water Outfall | 1. floating debris 2. turbidity | 1. pieces of paper, wood pallet and dirt 2. Environmental dust/dirt | Materials handling training 7/05 |
| 01/28/05 | Storm water Outfall | 1. floating debris 2. turbidity | 1. pieces of paper, wood pallet and dirt 2. Environmental dust/dirt | Materials handling training 7/05 |
| 02/11/05 | Storm water Outfall | 1. floating debris 2. turbidity | 1. pieces of paper, wood pallet and dirt 2. Environmental dust/dirt | Materials handling training 7/05 |
| 04/28/05 | Storm water Outfall | 1. floating debris 2. turbidity | 1. pieces of paper, wood pallet and dirt 2. Environmental dust/dirt | Materials handling training 7/05 |

156.   TROJAN stormwater sample during the 2004-05 Permit Term had lead concentrations of 2.1 mg/L (~2400% over Benchmark), 14 mg/L (~17,000% over Benchmark) and 2.0 mg/L (~2400% over Benchmark).

157.   Despite these exceedances, TROJAN makes two shocking certification in Form 5/Evaluation 2005 for each of the 14 potential pollutant sources/industrial activity areas described therein: 1) all BMPs have been fully implemented; and 2) no additional/revised BMPs are necessary.

158.   Form 5/Evaluation 2005 describes no deficiencies in BMPs or BMP implementation, and describes no additional or revised BMPs.

<u>2005-2006 Storm Water Permit Compliance Reports</u>

159.   TROJAN'S Safety and Environmental Manager Ismael Pedroza certified the Facility's 2005-06 Annual Report (EXHIBIT J) on June 26, 2006.

160.   TROJAN's 2005-06 Annual Report includes Form 4 for recording the Facility's Monthly Visual Observations of Storm Water Discharges ("Form 4/Observations 2006").

161.   Form 4/Observations 2006 includes notes detailing observations of stormwater discharges for 7 dates, which are faithfully reproduced at TABLE 8.

TABLE 8
<u>Defendant's Form 4/Observations 2006</u>

| DATE/TIME OF OBSERVATION | DRAINAGE AREA DESCRIPTION | DESCRIBE STORM WATER DISCHARGE CHARACTERISTICS | IDENTIFY AND DESCRIBE SOURCE(S) OF POLLUTANTS | DESCRIBE ANY REVISED OR NEW BMPs AND THEIR DATE OF IMPLEMENTATION |
|---|---|---|---|---|
| 10/16/05 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | Materials handling technique annual training 8/06 |
| 12/09/05 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | Materials handling technique annual training 8/06 |
| 01/03/06 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | Materials handling technique annual training 8/06 |
| 02/27/06 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | Materials handling technique annual training 8/06 |
| 03/03/06 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | Materials handling technique annual training 8/06 |
| 04/27/06 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | Materials handling technique annual training 8/06 |
| 05/22/06 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | Materials handling technique annual training 8/06 |

162.   TROJAN certified in Form 5/Evaluation 2006 for each of the 8 potential pollutant sources/industrial activity areas described therein: 1) all BMPs have been

fully implemented; and 2) no additional/revised BMPs are necessary.

163.   Form 5/Evaluation 2006 describes no deficiencies in BMPs or BMP implementation, and describes no additional or revised BMPs.

2006-2007 Storm Water Permit Compliance Reports

164.   TROJAN'S Safety and Environmental Manager Ismael Pedroza certified the Facility's 2006-07 Annual Report (EXHIBIT K) on June 27, 2007.

165.   TROJAN's 2006-07 Annual Report includes Form 4 for recording the Facility's Monthly Visual Observations of Storm Water Discharges ("Form 4/Observations 2007").

166.   Form 4/Observations 2007 includes notes detailing observations of stormwater discharges for 5 dates, which are faithfully reproduced at TABLE 9.

TABLE 9
Defendant's Form 4/Observations 2007

| DATE/TIME OF OBSERVATION | DRAINAGE AREA DESCRIPTION | DESCRIBE STORM WATER DISCHARGE CHARACTERISTICS | IDENTIFY AND DESCRIBE SOURCE(S) OF POLLUTANTS | DESCRIBE ANY REVISED OR NEW BMPS AND THEIR DATE OF IMPLEMENTATION |
|---|---|---|---|---|
| 11/27/06 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | "Materials handling technique annaul training 8/07" |
| 12/27/06 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | "Materials handling technique annaul training 8/07" |
| 01/05/07 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | "Materials handling technique annaul training 8/07" |
| 02/19/07 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | "Materials handling technique annaul training 8/07" |
| 04/19/07 | Storm water Outfall | 1. turbidity 2. floating debris | 1. pieces of paper, cardboard, wood pallet and dirt debris | "Materials handling technique annaul training 8/07" |

167.   TROJAN stormwater sample during the 2006-07 Permit Term had lead

COMPLAINT

37

concentrations of 13.6 mg/L (~15,700% over Benchmark), and 10.5 mg/L (~12,700%
over Benchmark).

168.    TROJAN certified in Form 5/Evaluation 2007 for each of the 8 potential
pollutant sources/industrial activity areas described therein: 1) all BMPs have been
fully implemented; and 2) no additional/revised BMPs are necessary.

169.    Form 5/Evaluation 2007 describes no deficiencies in BMPs or BMP
implementation, and describes no additional or revised BMPs.

2007-2013 Storm Water Permit Compliance Reports

170.    TROJAN'S compliance reports for Permit Terms 2007-08 (EXHIBIT L),
2008-09 (EXHIBIT M), 2010-11 (EXHIBIT O) and 2012-13 (EXHIBIT X) contain
substantially identical language to those reproduced in TABLES 2 through 9.  Forms 4
in each of the Annual Reports submitted by TROJAN for these Permit Terms include
notes from Ismael Pedroza in which he describes visually observing turbid water with
floating pieces of paper, wood pallet and dirt/debris and proposes trainings as an
adequate solution.

171.    Forms 5 in each of the Annual Reports submitted by TROJAN for these
Permit Terms include notes from Ismael Pedroza in which he certifies that all BMPs
have been implemented, there are no deficiencies in BMPs implementation and that
no additional/revised BMPs are necessary.

/ /

/ /

COMPLAINT

I.    **2013 to 2017 Pattern of Permit Violations Indicates Ongoing Corporate Culture of Disregard for Public Health and Environmental Damage**

172.    As detailed in TABLE 10 below, stormwater data submitted by TROJAN to the State of California between 2013 and 2017 demonstrates a continuation of Defendant's pattern of discharging highly contaminated stormwater and its failure to take adequate remedial action, which Plaintiff allege establishes ongoing, daily violations of the Permit and Act since *at least* August 15, 2012.

TABLE 10
2013 to 2017 Stormwater Pollution Data As Certified by Defendant

| Permit Term | Sample Date | Pb Concentration | Percent Benchmark Exceedance |
|---|---|---|---|
| 2013-2014* | 02.27.14 | 2.4 mg/L | ~2700% |
| 2014-2015 | 12.02.14 | 2.6 mg/L | ~3000% |
| | 12.14.14 | 0.73 mg/L | ~800% |
| 2015-2016 | 12.22.15 | 2.7 mg/L | ~3100% |
| | 02.17.16 | 0.25 mg/L | ~300% |
| 2016-17* | 02.06.17 | 0.37 mg/L | ~460% |
| | 02.22.17 | 0.56 mg//L | ~680% |

* - indicates Permit Term during which TROJAN failed to collect samples during *at least* the first half of the winter.

2013-2014 Storm Water Permit Compliance Reports

173.    The Facility's 2013-14 Annual Report (EXHIBIT Y) was submitted electronically by TROJAN'S Director of Environment, Health and Safety Ismael Pedroza on September 22, 2014, which is approximately 80 days late.

174.    The Facility's 2013-14 Annual Report includes Form 4 Monthly Visual Observations of Storm Water Discharges ("Form 4/Observations 2014") for eight dates during the Permit Term: 10/09/2013, 11/27/2013, 12/27/2013, 01/17/2014,

02/14/2014, 03/14/2014, 04/11/2014 and 05/31/2014.

175.    Defendant provided an identical response for each date on Form 4/Observations 2014, which is faithfully reproduced at TABLE 11.

TABLE 11
Defendant's Form 4/Observations 2014

| Were Pollutants Observed? | Drainage Area Description | Describe Discharge Characteristics | Identify and Describe Source(s) of Pollutants | Describe any Revised or New BMPs & Their Implementation Date |
|---|---|---|---|---|
| Yes | Storm water outfall | Floating debris and turbidity | Pieces of paper, cardboard and wood pallet pieces | Material handling training (11/2013) Annual Storm Water Training (12/2013) |

176.    The 2013-2014 Annual Report includes Form 5 Annual Comprehensive Site Compliance Evaluation ("Form 5/Evaluation 2014"), in which TROJAN describes eight potential pollutant Source(s)/Industrial Activity Areas.

177.    Form 5/Evaluation 2014 requires TROJAN to answer the following question: "Are Additional/Revised BMPs Necessary?" For each of the eight pollutant sources described, TROJAN responded "No."

178.    Form 5/Evaluation 2014 requires TROJAN to identify "Deficiencies in BMPs or BMP Implementation." For each of the eight pollutant sources identified, TROJAN responded "None."

2014-2015 Storm Water Permit Compliance Reports

179.    The Facility's 2014-15 Annual Report (EXHIBIT Z) was submitted electronically by TROJAN'S Director of Environment, Health and Safety Ismael Pedroza on August 20, 2015, which is approximately 50 days late.

180.    TROJAN'S 2014-15 Annual Report includes Form 4 Monthly Visual Observations of Storm Water Discharges ("Form 4/Observations 2015") for eight dates during the Permit Term: 10/31/2014, 11/14/2014, 12/02/2014, 01/10/2015, 02/07/2015, 03/27/2015, 04/07/2015, 05/07/2015.

181.    Defendant provided an identical response for each date Form 4/Observations 2015, which is faithfully reproduced at TABLE 12.

TABLE 12
Defendant's Form 4/Observations 2015

| Were Pollutants Observed? | Drainage Area Description | Describe Discharge Characteristics | Identify and Describe Source(s) of Pollutants | Describe any Revised or New BMPs & Their Implementation Date |
|---|---|---|---|---|
| Yes | Storm water outfall | Floating debris and turbidity | Pieces of paper, cardboard and wood pallet pieces | Continue Forklift and Material handling training (2/26/15) Storm Water Training (2/4/15) |

182.    The Facility's 2014-2015 Annual Report includes Form 5 of is the Annual Comprehensive Site Compliance Evaluation ("Form 5/Evaluation 2015"), in which TROJAN describes eight potential pollutant Source(s)/Industrial Activity Areas.

183.    TROJAN's responses to the prompts on Form 5/Evaluation 2015 parallel the answers provided since 1992.  TROJAN certified at Form 5/Evaluation 2015 that all BMPs have been fully implemented, no additional/revised BMPs are necessary and there are no deficiencies in BMPs or BMP implementation.

COMPLAINT

2015-2016 Storm Water Permit Compliance Reports

184.   TROJAN submitted the Facility's 2015-16 Annual Report on June 30, 2016, in which Ismael Pedroza certified that the had completed the Annual Evaluation on June 21, 2016.

## J.   Defendants' Intentional Violation of ERA Requirements

185.   Plaintiff is informed and believes, and thereon alleges, that TROJAN submitted stormwater sampling data for 2015-16 Permit Term through the State Board's online database on June 30, 2016.

186.   Data submitted by the Defendant (see TABLE 10 above) demonstrates that the Facility's stormwater discharges were sufficiently contaminated to trigger the requirements of the 2015 Permit's mandatory Exceedance Response Action (ERA) Level 1 process for both zinc and lead.

187.   The purpose of the ERA process is remedial, i.e. to force TROJAN to evaluate why its stormwater contained high pollutant concentrations, and to identify BMPs necessary to prevent future exceedances. In general, the ERA Level 1 process requires TROJAN to, among other things: i) undertake an evaluation of the sources of zinc and lead at the Facility; ii) prepare a report identifying the sources and developing revised or additional BMPs to reduce concentrations of these pollutants in stormwater discharges; and iii) implement revised and/or additional BMPs so as to comply with the Act's BCT and BAT mandates.

188.   In order to comply with the Permits requirements, TROJAN was to have

completed an ERA evaluation related to zinc and lead by October 1, 2016; and then to submit an ERA Level 1 Technical Report for zinc and lead by January 1, 2017.

189.   On September 19, 2016, TROJAN uploaded an ERA Level 1 Report for zinc ("Zinc ERA Report") to the State Board's online database.

190.   TROJAN did not prepare or submit an ERA Level 1 Report for lead at the time it completed its Zinc ERA Report.

191.   Approximately fifty (50) days after receiving CCAT's 60-day Notice Letter, TROJAN uploaded an ERA Level 1 Report for lead for the Facility based on exceedances of NAL values for lead during the 2015-16 Storm Water Year ("Lead ERA Report").  The Permit requires any such report be prepared and submitted by January 1, 2017.  Thus, the Lead ERA Report was submitted in response to CCAT's Notice Letter and was more than nine (9) months late.

192.   The Lead ERA Report proposes eleven (11) BMPs to reduce pollutant concentrations sufficient to bring it into compliance with the Permit and Act.

193.   Of the eleven (11) BMPs proposed, only ten (10) are proposed for immediate implementation.

194.   Plaintiff alleges on information and belief that the proposed BMP additions and/or revisions included the ERA-triggered remedial plan do not bring the Facility into compliance with the Permit or Act.  In fact, few if any of the BMPs proposed in the ERA-triggered remedial plan constitute new or revised pollution control strategies.

COMPLAINT

195.   The first BMP proposed to address lead pollution from the Facility is to use (and replacement) of filter socks.  Filter socks are flexible tubes of special material designed to filter out contaminants in stormwater as it passes through the "sock."  Filter socks are considered a form of passive treatment.

196.   The use of filter socks is a BMP listed in TROJAN's 2016 SWPPP, i.e. TROJAN proposed this BMP for implementation on or before December 19, 2016.  As such, it is not a new BMP that can be reasonably anticipated to prevent and reduce pollutants in any appreciable way.

197.   The second BMP proposed to address lead pollution from the Facility is to move lead-containing materials away from the sampling location.  Presumably, moving the lead-containing materials further away will allow for any stormwater that contacts these pollutant sources to filter through the filter socks.

198.   The re-location of lead-containing materials away from the sampling location is a BMP listed in Form 5 of the Facility's 1999-2000 Annual Report as well as in its 2015 SWPPP, i.e. TROJAN was to be implementing this BMP since at least July 2000.  As such, it is not a new BMP that can be reasonably anticipated to prevent and reduce pollutants in any appreciable way.

199.   The third BMP proposed to address lead pollution from the Facility is to cover lead-containing materials stored outdoors with tarps ("Tarp BMP").  This BMP is intended to minimize exposure of rainwater to lead-containing materials, and thus reduce or prevent lead contamination.

COMPLAINT

200.   TROJAN first proposed the Tarp BMP in its 1992-93 Annual Report for the Facility, and has listed it as an existing BMP on numerous occasions since, including two important documents.  First, TROJAN lists the Tarp BMP as *an existing* BMP in its 2010 SWPPP, specifically noting that pollutant sources stored outdoors will be "covered in plastic to protect from rain".

201.   TROJAN again proposed the use of the Tarp BMP in its response to a Notice of Violation issued by the Regional Board in 2013.  The Regional Board's communication noted that "staff observed lead ingots and lead cells stored in the outdoor area without BMPs."  In its response, TROJAN informed the Regional Board "lead ingots have been covered with a heavy duty tarp," and included a picture to proof that it has implemented the Tarp BMP as of October 30, 2013.  As such, it is not a new BMP that can be reasonably anticipated to prevent and reduce pollutants in any appreciable way.

202.   The forth BMP proposed to address lead pollution from the Facility is the installation of awning to replace the Tarp BMP "as a long-term solution."

203.   Plaintiff alleges on information and belief that the construction of a more robust covering for the outdoor storage of lead and other toxic materials is something that TROJAN has been investigating and/or considering since at least 2013.  Furthermore, the implementation of this BMP is, at best, months away from being completed.  Lastly, Plaintiff alleges that even upon full implementation, this source control or exposure minimization BMP does not meet the BAT standard.

COMPLAINT

45

204.   The fifth BMP proposed to address lead pollution from the Facility is to install and maintain downspout filters.

205.   Plaintiff alleges on information and belief that this is the first time TROJAN has proposed a BMP using filters for downspouts.

206.   CCAT is informed and believes, and thereon alleges that TROJAN first proposed "running most of the stormwater through [the] water treatment system" in its 1999-2000 Annual Report for the Anne Facility.

207.   TROJAN describes alternatively its use of the on-site industrial wastewater treatment system as a stormwater management BMP in the 2010 SWPPP as: a Current Baseline BMP ("Storm water runoff is controlled through the storm water conveyance system.  Storm water runoff is directed to the truck well where it is treated at the water treatment system.  After 2 hours, the runoff is diverted from the truck well to the street."); and as a Proposed Advanced BMPs ("Accumulate water for 3 hours in truck well and direct to water treatment, then open valves to direct water to storm drain.").

208.   Plaintiff alleges that subsequent descriptions regarding the use of the on-site wastewater treatment system can be found in TROJAN's 2010 SWPPP, 2015 SWPPP, 2016 SWPPP, and August 2017 SWPPP.

209.    CCAT is informed and believes, and thereon alleges that TROJAN has repeatedly proposed the use of regular or weekly street sweeping as a BMP.  Based on publicly available records, TROJAN first proposed regular or weekly sweeping of the

Facility's exterior in the 1999-00 Annual Report.  The Facility's 2003-04 Annual

Report again indicates that as of 2004, TROJAN had hired a street sweeping company

to conduct weekly sweeping of the yard.  The Facility's 2016 SWPPP identifies the

following as a prospective BMP, i.e. not existing by proposed for future use: "Institute

an outside yard-cleaning program on a regular basis using a conventional sweeper."

210.   The Facility's 2003-04 Annual Report indicates that the yard is washed

down quarterly (sent to treatment) and that the "yard is swept once a week by a

sweeping company."

211.   CCAT is informed and believes, and thereon alleges that TROJAN first

began developing BMPs to address the track-out of lead on its forklifts in the

Facility's 2000-01 Annual Report.  TROJAN again develops this BMP in the 2010

SWPPP, which is dated May 11, 2010.  In the 2010 SWPPP, this BMP occur in green,

which according to the documents legend indicates that it was a new BMP and slated

for implementation by June 1, 2010.  TROJAN describes "assign[ing] one forklift for

outside use only and a daily cleaning procedure has been developed for all forklifts."

212.   TABLE 13 summarizes the various BMPs listed in TROJAN's ERA Level

1 report for lead, including whether the BMP has been proposed before, and the

document and date on which that BMP was previously proposed.

/ /

/ /

/ /

COMPLAINT

TABLE 13
Defendant's Recycled BMPs From Past Compliance Documents

| BMP No. | BMP Description | New | Old | Date First Implemented | Implementation Document |
|---------|----------------|-----|-----|----------------------|------------------------|
| 1 | Install, maintain and replace filtration wattles/socks to slow and filter stormwater before discharge to street | | x | 12/19/2016 | SWPPP Revision: K at page 4 |
| 2 | Store lead containing materials away from discharge point/sampling location | | x | 1/1/2000 | 1999-2000 Annual Report Form 5 |
| 3 | Raise lead-containing material stored outdoors off the ground and cover with plastic, tarps, or similar structural BMP to prevent contact with stormwater | | x | 10/30/2013 | NOV Response 10/30/2013 |
| 4 | Install, maintain and replace filters in downspouts/catch basins | x | | | n/a |
| 5 | Create vacuum program to address contamination from fugitive emissions and outdoor materials storage areas | | x | 5/11/2010 | SWPPP Revision: I at page 6 |
| 6 | Designate inside forklift to avoid tracking lead into outside areas | | x | 6/31/2010 | SWPPP Revision: I at page 7 |
| 7 | Dispose of unused equipment and old materials stored in the yard | | x | 10/30/2013 | NOV Response 10/30/2013 |
| 8 | Automate the off-loading process for pasted plates | | x | 6/31/10 | SWPPP Revision: I at page 7 |
| 9 | Install catch pans under lead shaving machines | x | | | n/a |
| 10 | Paint/Replace rusted material and equipment stored outdoors | | x | 11/4/2013 | NOV Response 10/30/2013 |

# V.    LEGAL BACKGROUND

## A.    The Clean Water Act.

213.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the Act. Among other things, section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a

NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

214.   The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

215.   Section 402(p) of the Act establishes a framework for regulating industrial storm water discharge under the NPDES permit program. 33 U.S.C. § 1342(p).

216.   Section 402(b) of the Act allows each state to administer an EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.  *See* 33 U.S.C. § 1342(b).

217.   States with approved NPDES permit programs are authorized by Section 402(b) to regulate industrial storm water discharges through the issuance of a statewide general NPDES permit applicable to all industrial dischargers and/or through individual NPDES permits issued to dischargers.  *See* 33 U.S.C. § 1342(b).

218.   In California, the relevant NPDES permit is the General Permit, which is issued by the State Board and implemented by the Regional Board for the region in question. *See* 33 U.S.C. § 1311(a), 1342, 1362(6), (7), (12).

219.   "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow

of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 122.2.

220.   The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 122.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

221.   The Act confers jurisdiction over waters that are tributaries to traditionally navigable waters where the water at issue has a significant nexus to the navigable water.  *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007).

222.   A significant nexus is established if the water in question "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 780; *N. Cal. River Watch*, 496 F.3d at 999-1000.

223.   A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000–01.

224.   Section 505(a)(1) of the Act provides for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation…or an order issued by the Administrator or a State with respect to such a

standard or limitation." *See* 33 U.S.C. §§ 1365(a)(1) and 1365(f).

225.    TROJAN is a "person" within the meaning of section 502(5) of the Act. *See* 33 U.S.C. § 1362(5).

226.    "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a)1 against unpermitted discharges; or (b) a condition of an NPDES permit such as the General Permit. *See* 33 U.S.C. § 1365(f).

227.    An action for injunctive relief is authorized under section 505(a) of the Act. *See* 33 U.S.C. § 1365(a)(1).

228.    Each separate violation of the Act subjects the violator to a penalty of up to $51,570 per day for violations occurring after November 2, 2015; and up to $37,500 per day per violation for violations occurring prior to and including November 2, 2015.  *See* 33. U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

229.    Section 505(d) of the Act allows prevailing or substantially prevailing parties to recover litigation costs, including fees for attorneys, experts, and consultants.  *See* 33 U.S.C. § 1365(d).  The court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate. *Id*.

230.    An award of litigation fees/costs is typically appropriate for two classes of litigants.  The first class is defendants who are forced to litigate frivolous claims.

231.   The second class of litigants to whom fee/cost awards are typical is plaintiffs that prevail in either the technical sense, i.e. achieve a favorable final ruling, or that realize the results (or something close) they set out to achieve even if short of a final judgment on the merits, i.e. advance the goals of the Act.  "Under the Act, plaintiffs are also protected from the suddenly repentant defendant by the authority of the district courts to award litigation costs whenever the court determines such award is appropriate. 33 U. S. C. § 1365(d).  The legislative history of this provision states explicitly that the award of costs "should extend to plaintiffs in actions which result in successful abatement but do not reach a verdict.  For instance, if as a result of a citizen proceeding and before a verdict is issued, a defendant abated a violation, the court may award litigation expenses borne by the plaintiffs in prosecuting such actions. S. Rep. No. 92-414, p. 81 (1971), 2 Leg. Hist. 1499." Gwaltney of Smithfield v. Chesapeake Bay Foundation, 484 U.S. 49, fn6 (1987).

**B.    California's Stormwater Permit.**

232.   The State Board is charged with regulating pollutants to protect California's water resources.  *See* Cal. Water Code § 13001.

233.   California is a state authorized by EPA to issue NPDES permits.

234.   Between 1997 and June 30, 2015, the Permit in effect in California was Order No. 97-03-DWQ, which CCAT refers to herein as the "1997 Permit."

235.   On July 1, 2015, California re-issued the Permit pursuant to Order No. 2014-0057-DWQ's NPDES, which is referred to herein as the "2015 Permit."

236.   The 2015 Permit superseded the 1997 Permit, except for enforcement purposes, and its terms are as stringent, or more so, than the terms of the 1997 Permit. *See* 2015 Permit, Findings, ¶ 6.

237.   Prior to beginning industrial operations, dischargers are required to apply for coverage (or enroll) under the Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated With Industrial Activities ("NOI") to the appropriate Regional Board. 1997 Permit, Finding #3; 2015 Permit, Findings, ¶ 17.

238.   The NOI Certification requires a prospective permittee to sign and attest to the following statement: "I certify that the provisions of the permit, including the development and implementation of a Storm Water Pollution Prevention Plan and a Monitoring Program Plan, will be complied with."

239.   In order to lawfully discharge polluted storm water in California, industrial dischargers must secure coverage under the Permit and comply with its terms; or obtain and comply with an individual NPDES permit.  1997 Permit, Finding #2; 2015 Permit, Findings, ¶ 12.

240.   Compliance with the Permit constitutes compliance with the Act for purposes of storm water discharges.  33. U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, violations of the General Permit are violations of the Act. 1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

241.   In order to encapsulate an entire winter in each Permit reporting period,

COMPLAINT

the Permit does not follow the calendar year.  Instead the Permit runs between July 1 and June 30 ("Permit Term"), e.g. the 2001-2002 Permit Term runs from July 1, 2001 to June 30, 2002.

242.   In order to comply with the Permit's mandate, owners and operators must consistently engage in a common sense compliance strategy that includes at least four independent, but mutual-reinforcing actions: i) executive planning and design; ii) on-the-ground implementation; iii) monitoring and reporting; and iv) corrective actions, i.e. adjust and/or add pollution control strategies in response to data evidencing deficiencies.

243.   Each of the four actions is a necessary condition for compliance with the Permit and Act.  Without conducting executive planning and design, a facility's staff is highly unlikely to arbitrarily implement pollution control strategies that achieve BAT/BCT, i.e. prevent or reduce pollution in stormwater discharges. Similarly, without consistent and reliable on-the-ground implementation, no amount of expert design/planning will prevent and reduce pollutants in stormwater discharges. And without adequate monitoring and data collection, a permittee does not possess information about the efficacy of pollution control measures that is essential to designing and implementing effective corrective actions.

244.   Compliance with the General Permit does necessitate that each prong be completed perfectly, but all must be consistently *and sincerely* pursued.

245.   The single most important factor for determining a Permittee's

compliance with the Permit is the taking of effective remedial measures when monitoring data indicates that pollution control strategies are ineffective, i.e. exceedances of numeric limits and other water quality standards.

## C.    The Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations

246.    The Permit contains a Discharge Prohibition on direct and indirect discharges of materials other than storm water ("non-storm water discharges") that are not otherwise authorized by an NPDES permit to waters of the United States. 1997 Permit, Section A(1); 2015 Permit, Section III(B).

247.    The Permit contains a Discharge Prohibition on storm water discharges and authorized non-storm water discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in section 13050 of California Water Code.  1997 Permit, Section A(2); 2015 Permit, Section III(C).

248.    The Permit contains an Effluent Limitation that requires permittee facilities to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  40 C.F.R. §§ 401.15-16; 1997 Permit, Section B(3); 2015 Permit, Section V(A).

249.    Compliance with this Effluent Limitation requires permittee facilities to implement effective, site-specific structural and non-structural pollution control

strategies called Best Management Practices ("BMPs") that are designed to prevent or reduce storm water discharges consistent with BAT and/or BCT.

250.   BAT and BCT include both structural (e.g. installation of curbs to direct storm water flows) and non-structural (e.g. sweeping) measures.

251.   § 304(a)(4) of the Act identified "conventional pollutants" to include Total Suspended Solids ("TSS"), Oil and Grease ("O&G) and pH.  *See* 40 C.F.R. 401.16.  As discussed in more detail below, every permittee must design BMPs for all sources of TSS, O&G and pH that meet the BCT standard; and thereafter implement, maintain and revise/adapt such BMPs so as to ensure the concentration of TSS, O&G and pH in any storm water discharge is reduced or prevented consistent with the BCT standard.

252.   Lead is a pollutant identified on the list of toxic pollutants designated pursuant to the Act's section 307(a)(1) at 40 C.F.R. 401.15.  As discussed in more detail below, this designation requires TROJAN to design BMPs for all sources of lead and lead compounds that meet the more stringent BAT standard; and thereafter implement, maintain and revise/adapt such BMPs so as to ensure the concentration of lead and lead compounds in any storm water discharge is reduced or prevented consistent with the BAT standard.

253.   EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("Benchmarks").  EPA Benchmarks are numeric,

COMPLAINT

concentration-based thresholds.  For example, EPA has established the following Benchmark for lead: 0.0816 milligrams per liter (mg/L).  Generally, a lower concentration Benchmark is set for pollutants that are known to be toxic, e.g. the Benchmark for iron is set at 1.0 mg/L.

254.   EPA's Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a facility achieve the statutory BAT/BCT standards.  *See* MSGP, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); *see also* MSGP, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); *see also* MSGP, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

255.   Discharges from an industrial facility containing pollutant concentrations that exceed EPA Benchmarks indicate that the facility has not developed and/or implemented BMPs that meet BAT for toxic pollutants and/or BCT for conventional pollutants. *Id*.

256.   The persistent discharge of stormwater containing pollutant concentrations that exceed the Benchmarks provide *prima facie* evidence that a facility has failed to complete one or more of the four prongs of Permit compliance— i) planning and design; ii) on the ground BMP implementation; iii) monitoring; or iv) BMP revision and addition. *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, as modified effective May 9, 2009.

257.   While the Permit and case law make clear that a single or isolated set of

Benchmark exceedances is not a violation of the Act, persistent exceedances of

multiple parameters establishes a violation of the Permit and therefore the Act.

258. The State Board established Numeric Action Levels ("NALs") in the

2015 Permit. *See* 2015 Permit, Section V(A).

259. NALs in the 2015 Permit serve as triggers for the remedial reporting

requirements called Exceedance Response Action evaluations and reports. NALs are

not a means to determining compliance with the effluent or receiving water

limitations. *See* 2015 Permit Fact Sheet, Section II at pp. 15-21.

260. NALs are not intended to serve as technology-based or water quality-

based numeric effluent limitations. The NALs are not derived directly from either

BAT/BCT requirements or receiving water objectives. NAL exceedances defined in

this General Permit are not, in and of themselves, violations of this General Permit.

2015 Permit, Finding 63 at p. 11.

261. NALs and EPA Benchmarks represent pollutant concentrations at which

a storm water discharge could impair, or contribute to impairing, water quality and/or

human health.

262. The Permit contains certain Receiving Water Limitations. 1997 Permit,

Receiving Water Limitation C(1)-(2); 2015 Permit, Section VI(A).

263. Receiving Waters are those surface or other waters to which pollutants

are discharged from a given facility.

264. The first Receiving Water Limitation is that discharges shall not cause or

contribute to an exceedance of any applicable water quality standard ("WQS").  *Id.*

265.   WQSs are numeric limits and narrative standards established by the State Board, the various regional boards, and the EPA to protect a Receiving Water's beneficial uses.

266.   WQS applicable to the discharges applicable to the Facility include, but are not limited to, those set out in the *Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties*[4], California Regional Water Quality Control Board, Los Angeles Region 4 (adopted June 13, 1994, as amended) ("Basin Plan") and in the Criteria for Priority Toxic Pollutants for the State of California, a.k.a. California Toxics Rule ("CTR"). 65 Fed. Reg. 31712 (May 18, 2000); 40 C.F.R. § 131.38.

267.   The Basin Plan identifies beneficial uses of the Receiving Waters, which include Reaches 2 and 1 of the San Gabriel River, Coyote Creek, San Gabriel River Estuary and San Pedro Bay, to include: Water Contact Recreation ("REC-1"); Non-Contact Water Recreation ("REC-2"); Rare, Threatened, or Endangered Species ("RARE"); Wildlife Habitat ("WILD"); Warm Freshwater Habitat ("WARM"); Ground Water Recharge ("GWR"); Municipal and Domestic Supply ("MUN"); Industrial Service Supply ("IND"); and Industrial Process Supply ("PROC"). *See* Basin Plan, Table 2-1.

---

[4] *Available at* http://www.waterboards.ca.gov/losangeles/water_issues/programs/basin_plan/.

COMPLAINT

59

268.   The Basin Plan includes a narrative WQS establishing that surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.  Basin Plan at 3-24.

269.   The Basin Plan includes a narrative WQS establishing that all waters shall be maintained free of toxic substances in concentrations that are toxic to or that produce detrimental physiological responses to human, plant, animal, or aquatic life. Basin Plan at 3-38.

270.   The Basin Plan includes a narrative WQS establishing that toxic substances shall not be present at levels that will bio-accumulate in aquatic life resources to levels that are harmful to aquatic life or human health.  Basin Plan at 3-39.

271.   The Basin Plan includes a narrative WQS for oil and grease which states that waters shall not contain oils, greases, waxes, or other materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses.  Basin Plan at 3-29.

272.   The Basin Plan provides that waters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses.  Basin Plan at 3-37.

273.   The Basin Plan provides that waters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or

adversely affect beneficial uses.  Basin Plan at 3-26.

274.   EPA promulgated the CTR based on a determination that the numeric criteria were necessary to protect human health and the environment.

275.   The CTR establishes short-term (acute) and long-term (chronic) aquatic life criteria for metals in both freshwater and saltwater. The acute criterion, defined in the CTR as the Criteria Maximum Concentration (CMC), equals the highest concentration of a pollutant to which aquatic life can be exposed for a short period of time (one hour) without deleterious effects. The chronic criterion, defined in the CTR as the Criteria Continuous Concentration (CCC), equals the highest concentration of a pollutant to which aquatic life can be exposed for an extended period of time (4 days) without deleterious effects.

276.   EPA has adopted freshwater numeric water quality standards in the CTR for lead at 0.065 mg/L (CMC) and 0.0025 mg/L (CCC).[5]

277.   The Act requires that California implement the criteria by ensuring that NPDES permits result in discharges that will meet the criteria.

278.   Any interpretation of the Permit under which compliance does not require that discharges meet CTR standards is equivalent to an interpretation that California's Permit program violates the Act.

---

[5] Criteria Maximum Concentration ("CMC") equals the highest concentration of a pollutant to which aquatic life can be exposed for a short period of time without deleterious effects.  Criteria Continuous Concentration ("CCC") equals the highest concentrations of a pollutant to which aquatic life can be exposed over extended periods of time without deleterious effects.  These values are expressed as a function of total hardness (mg/L) in the water body and correspond to a total hardness of 100 mg/L, which is the default listing in the CTR.

COMPLAINT

279.   The CTR criteria are legally applicable in the State of California for inland surface waters, enclose bays and estuaries for all purposes and programs under the Act; and apply at all times during wet and dry weather to inland surface waters. 40 C.F.R 131.38(a), (c)(1), and (d)(1).

280.    The CTR "criteria apply throughout the water body including at the point of discharge into the water body."  65 Fed. Reg. 31712 paragraph (c)(2)(i).

281.   The Permit's second Receiving Water Limitation is that storm water discharges shall not adversely impact human health or the environment. 1997 Permit, Receiving Water Limitation C(1); 2015 Permit, Section VI(B).

282.   The third Receiving Water Limitation is that concentrations of pollutants in storm water discharges shall not threaten to cause pollution or a public nuisance. *See* 2015 Permit, Section VI(C).

283.   Thus, a permittee facility violates the Permit's various Receiving Water Limitations when its storm water discharges contain pollutant levels that: i) violate an applicable WQS established in the Basin Plan or CTR; ii) exceed levels known to adversely impact human health or the environment; or iii) threaten to cause pollution or a public nuisance.

284.   Section 303(d)(1) of the Act requires each state to identify waters within its boundaries that do not meet water quality standards.  Those waters are placed on the state's "303(d) List" or "Impaired Waters List."

285.   The San Gabriel River was included on the 1998, 2002, 2006, 2010 and

2012 303(d) Lists as an impaired water body.

286.    According to the 2012 303(d) List of Impaired Water Bodies, Reach 2 of

the River is impaired for lead.[6]

287.    According to the 2012 303(d) List of Impaired Water Bodies Coyote

Creek is impaired for lead, copper, pH and toxicity.[7]

288.    According to the 2012 303(d) List of Impaired Water Bodies the San

Gabriel River Estuary is impaired for copper and nickel.[8]

289.    U.S. EPA established a San Gabriel River and Impaired Tributaries

Metal and Selenium Total Daily Maximum Concentration ("TMDL"), which was

subsequently incorporated into the Basin Plan via amendment by Resolution No. R13-

004.

290.    The regulatory mechanism used to implement the TMDL wasteload

allocations assigned to point sources, including the Facility, is the General Permit.

291.    The Receiving Waters are an important community resource.  Although

pollution and habitat destruction have drastically altered the natural ecosystem, the

Receiving Waters serve essential social functions, and serve as essential habitat for

dozens of fish and bird species, as well as macro-invertebrate and invertebrate species.

Storm water and non-storm water contaminated with sediment, heavy metals, and

other pollutants harm the special aesthetic and recreational significance the Receiving

[6] *Available at* http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2012.shtml
[7] Id.
[8] Id.

Waters have for people in surrounding communities, including CCAT's members. The public's use of the Receiving Waters for water contact sports and fishing exposes many people to toxic metals, pathogens, bacteria and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife observation, are also impaired by polluted discharges to the Receiving Waters.

292. Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of the Permit's Receiving Water Limitations.

293. Numeric WQS applicable to the Facility include, but may not be limited to, those detailed in TABLE 14.

**TABLE 14**
WATER QUALITY STANDARDS APPLICABLE TO THE FACILITY[9]

| Parameter | Source | Numeric Limit |
|---|---|---|
| pH | Basin Plan | 6.5-8.5 s.u. |
| Al | Basin Plan | 1.0 mg/L |
| Cu | CTR | 0.013 mg/L (CMC) |
| Zn | CTR | 0.120 mg/L (CMC) |
| Pb | CTR | 0.065 mg/L (CMC) |
| Ni | CTR | 0.470 mg/L (CMC) |
| Cr | CTR | 0.016 mg/L (CMC) |
| Antimony | CTR | unknown |
| Arsenic | CTR | 0.34 mg/L (CMC) |

294. Discharges of pollutants that violate applicable WQS contribute to the

---

[9] Several of the CTR limits are hardness dependent. Defendant shall adjust the limit using the methods provided in Appendix J of the 2008 EPA Multi-Sector General Permit based on receiving water sampling hardness data as applicable.

COMPLAINT

impairment of the beneficial uses of the waters receiving the discharges and constitute

violations of the Permit and Act.

295.   Benchmarks and/or NALs established for conventional and industry

specific pollutants discharged from the Facility, and for which TROJAN must analyze

stormwater samples, are summarized below at TABLE 15.

**TABLE 15**
BENCHMARK AND NAL VALUES APPLICABLE TO THE FACILITY[10]

| PARAMETER/ POLLUTANT | EPA BENCHMARK | ANNUAL NAL | INSTANTANEOUS MAXIMUM NAL |
|---|---|---|---|
| pH | 6.0-9.0 s.u. | n/a | 6.0-9.0 s.u. |
| TSS | 100 mg/L | 100 mg/L | 400 mg/L |
| O&G | 15 mg/L | 15 mg/L | 25 mg/L |
| TOC | 110 mg/L | 110 mg/L | n/a |
| COD | 120 mg/L | 120 mg/L | n/a |
| Al | 0.75 mg/L | 0.75 mg/L | n/a |
| Fe | 1.0 mg/L | 1.0 mg/L | n/a |
| Zn | 0.117 mg/L | 0.26 mg/L | n/a |
| Ni | 1.02 mg/L | 1.02 mg/L | n/a |
| Mg | 0.064 mg/L | 0.064 mg/L | n/a |
| Cu | 0.0332 mg/L | 0.0332 mg/L | n/a |
| Pb | 0.0816 mg/L | 0.262 mg/L | n/a |

**D.    The Permit's Planning and BMP Design Requirements.**

296.   Dischargers must develop and implement a Storm Water Pollution

Prevention Plan ("SWPPP") at the time industrial activities begin. 1997 Permit,

Sections A(1)(a) and E(2); 2015 Permit, Sections I(I) (Finding 54) and X(B).

---

[10] Several of the 2008 EPA Benchmark based limits and CTR limits are hardness dependent.  Defendant shall adjust the limit using the methods provided in Appendix J of the 2008 EPA Multi-Sector General Permit based on receiving water sampling hardness data as applicable.

COMPLAINT

297.    The SWPPP must include, *inter alia*: i) a narrative description and summary of all industrial activity, potential sources of pollution, and pollutants associated with each potential source; ii) a description of dust and particulate generating activities; iii) a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; iv) a description of storm water management practices; v) a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; vi) the identification and elimination of non-storm water discharges; vii) identify and locate where materials are being shipped, received, stored, handled, as well as typical quantities of such materials and the frequency with which they are handled; and viii) a description of persons and their current responsibility for developing and implementing the SWPPP. 1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

298.    The 2015 Permit requires certain SWPPP enhancements, including a more comprehensive assessment of potential pollutant sources, and more specific descriptions of BMPs to be implemented.  *See* 2015 Permit Sections X(G)(2), (4), (5).

299.    The objectives of the SWPPP are to: i) identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges; and ii) to identify and describe site-specific BMPs to reduce or prevent the discharge of polluted storm water from industrial facilities.  1997 Permit,

Section A(2); 2015 Permit, Section X.

300.   The SWPPP must evaluate sources of pollution associated with industrial activities ("Source Evaluation and Pollutant Assessment") and identify pollutants that may affect the quality of stormwater, and authorized non-stormwater discharges from each discharge point at the permittee facility ("Pollutant Assessment").  1997 Permit, Section A(2); 2015 Permit, Section X(G).

301.   The SWPPP must describe site-specific BMPs tailored to the facility based on the Source Evaluation and Pollutant Assessment. 1997 Permit, Section A(2); 2015 Permit, Section X(H).

302.   Owners/Operators must then implement those BMPs so as to prevent or reduce pollutants associated with industrial activity in storm water and authorized non-stormwater discharges.

303.   Site-specific BMPs must achieve pollutant discharge reductions attainable via BCT and BAT. 1997 Permit, Order Section A(2); 2015 Permit, Section I(D) (Finding 32), Section X(C).

304.   The SWPPP must be evaluated at least annually, and revised as necessary, to ensure ongoing compliance.  *See* 1997 Permit Sections A(9)-(10); *see also* 2015 Permit § X(B).

305.   Failures to develop, implement, and/or revise an adequate SWPPP constitutes independent Permit violations.  *See* 2015 Permit, Fact Sheet, Section I(1).

306.   The Permit requires that the discharger conduct an Annual

Comprehensive Site Compliance Evaluation ("Compliance Evaluation") that includes a review of all visual observation records, inspection reports and sampling analysis data, a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system, a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and/or maintained, or whether additional BMPs are needed, and a visual inspection of equipment needed to implement the SWPPP.  1997 Permit, Sections A(9)(a)-(c); 2015 Permit, Section XV.

307.   Section A(9)(d) of the 1997 Permit requires that the discharger submit a Compliance Evaluation each year that includes an identification of personnel performing the evaluation, date(s) of the evaluation(s) necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Permit.  1997 Permit; Section A(9)(d)(i)-(vi).  If certification cannot be provided, the discharger must explain in the Compliance Evaluation why the facility is not in compliance.  1997 Permit, Section A(9)(d).  The evaluation report shall be submitted as part of the Annual Report specified in Section B(14) of the Permit.  1997 Permit, Section A(9)(d).

**E.    The Permit's Monitoring and Reporting Requirements.**

308.   The 1997 Permit required facility operators to develop a monitoring and reporting program ("M&RP") along with its SWPPP, and then implement the M&RP

as soon as industrial activities began. 1997 Permit, Sections B(1)-(2) and E(3).  The 2015 Permit contain virtually identical M&RP requirements.  2015 Permit, Sections X(I) and XI.

309.   The objective of the M&RP requirement is to inform dischargers about the effectiveness of BMPs design and implementation.

310.   As described above at paragraphs 43-44, if data gathered pursuant to the M&RP indicates that a facility's BMPs are inadequate to maintain compliance with the Permit (i.e. Discharge Prohibitions, Effluent Limitations, and/or Receiving Water Limitations), permittees must add BMPs, re-design BMPs and/or improve BMP implementation as necessary to ensure that storm water discharges are in compliance with the Permit.  *See* 1997 Permit, Section B(2); *see also* 2015 Permit, Sections X(I) and XI.

311.   Discharges must conduct monthly visual observations of storm water discharges as part of a legally adequate M&RP.  1997 Permit, Section B(4)(a); 2015 Permit, Section XI(A).

312.   Dischargers must visually observe and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in a discharge, and the source of any pollutants in storm water discharges from the facility.  Dischargers are required to maintain detailed records of each observation, as well as for corrective action taken to reduce or prevent pollutants from contacting storm water discharges.  *See* 1997 Permit, Section B(4)(c); *see also* 2015 Permit, Section

COMPLAINT

XI(A)(3).

313.   The Permit requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants from entering surface waters from a facility.  1997 Permit, Section B(4)(c), 2015 Permit, Section XI(B)(1).

314.   The Permit requires dischargers to visually observe and collect samples of storm water discharges from each location where storm water is discharged.  1997 Permit, Sections B(5) and B(7); 2015 Permit, Section XI(B)(4).

315.   Section B(5)(a) of the 1997 Permit required dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season (defined as October 1 to March 30) and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled.

316.   Section B(5)(b) required that sampling conducted pursuant to the 1997 Permit occur during scheduled facility operating hours that are preceded by at least three (3) working days without storm water discharge.

317.   Section XI(B)(1) of the 2015 Permit requires sampling from a Qualifying Storm Event ("QSE"), which is a precipitation event that produces a discharge from at least one drainage area and is preceded by forty-eight (48) hours with no discharge

COMPLAINT

from any drainage area.

318.    Dischargers are required to collect samples of storm water within 4 hours of the start of facility operations if the QSE began within the previous 12-hour period, e.g. for storms with discharges that begin during the night for facilities with day-time operations. 2015 Permit, Section XI(B)(5)(b).

319.    Section XI(B)(2) of the 2015 Permit requires dischargers to collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each Permit Term (January 1 to June 30).

320.    Section XI(B)(11) of the 2015 Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within thirty (30) days of obtaining all results for each sampling event.

321.    The Permit requires every discharger analyze each sample for certain Basic Parameters: pH, specific conductance ("SC"), TSS, and either total organic carbon ("TOC") or O&G.  1997 Permit, Section B(5)(c)(i); 2015 Permit, Sections XI(B)(6)(a)-(b).

322.    The Permit requires every discharger analyze each sample for The Permit also requires dischargers to analyze each sample for site-specific toxic chemicals and other pollutants associated with the industrial operations at the facility.  1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(c).

323.   The Permit requires every discharger analyze each sample for additional industrial parameters related to receiving waters with 303(d) listed impairments, or an approved TMDL. 1997 Permit, Section B(5)(c)(ii); 2015 Permit, Section XI(B)(6)(e).

324.   According to information and belief, CCAT alleges that the Permit requires TROJAN to sample for detailed above in TABLE 4 and TABLE 15.

325.   Section XII of the 2015 Permit establishes the procedures for Exceedance Response Actions, which are the activities that a permittee must completed when it has exceeded the annual and/or instantaneous NALs.

326.   A permittee enters Level 1 Status for a given parameter if sampling results indicate an NAL exceedance for that parameter.  2015 Permit, Section XII(C).

327.   Level 1 requirements include completing an evaluation by October 1 following commencement of Level 1 status, and filing a Level 1 ERA Report by the next January 1.  2015 Permit, Section XII.C.1-2.

328.   The Level 1 ERA Report must include detailed descriptions of new and/or revised BMPs that the permittee proposes for bringing the facility into compliance with the Permit's Discharge Prohibitions, Effluent Limitations and Receiving Water Limitations.  *Id.*

329.   Section B(14) of the 1997 Permit required that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory

COMPLAINT

reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13)(i).

330.    Section XVI of the 2015 Permit requires dischargers to submit a Compliance Checklist with each Annual Report that: i) indicates whether the discharger complies with, and has addressed all applicable requirements of the 2015 Permit; ii) an explanation for any noncompliance of requirements within the reporting year, as indicated in the Compliance Checklist; and iii) an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, the date(s) of the Annual Evaluation.  Most importantly, the Annual Report must outline those BMP revisions or additions, if any, are necessary for the permittee to comply with the Permit and Act.

## VI.    **CLAIMS FOR RELIEF**

### FIRST CAUSE OF ACTION
**Defendant's Discharges of Contaminated Storm Water in
Violation of the Permit's Effluent Limitations and the Act
(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

331.    CCAT re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

332.    CCAT is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities through the implementation of BMPs at the Facility that achieve BAT/BCT.

333. CCAT is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Facility occur every time storm water is discharged. Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Permit and the Act. *See* 1997 Permit, Effluent Limitation B(3); *see also* 2015 Permit, Section I(D) (Finding 32), Section V(A); *see also* 33 U.S.C. § 1311(b).

334. Defendants violate and will continue to violate the Permit's Effluent Limitations each and every time storm water containing levels of pollutants that do not achieve BAT/BCT standards discharges from the Facility.

335. Each and every violation of the Permit's Effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

336. Defendants' violations of the Permit's Effluent Limitations and the Act are ongoing and continuous.

337. By committing the acts and omissions alleged above, TROJAN is subject to an assessment of civil penalties for each and every violation of the Act occurring from August 15, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

338. An action for injunctive relief is authorized by section 505(a) of the Act, 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which

COMPLAINT

harm CCAT has no plain, speedy, or adequate remedy at law.

339.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**SECOND CAUSE OF ACTION**
**Defendant's Discharges of Contaminated Storm Water in**
**Violation of the Permit's Receiving Water Limitations and the Act**
**(33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

340.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

341.   CCAT is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment from the Facility occur each time storm water discharges from the Facility.

342.   CCAT is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards has been discharged and continues to be discharged from the Facility each time stormwater is discharged from the Facility.

343.   Plaintiff is informed and believes, and thereupon alleges, that since at least August 15, 2012, Defendants have discharged polluted storm water from the Facility

causing or contributing to the violation of the applicable WQS and that adversely impact human health or the environment in violation of the Receiving Water Limitation of the General Permit.

344.    Every day, since at least August 15, 2012, that Defendants have discharged polluted storm water from the Facility in violation of the Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

345.    Each and every violation of the Permit's Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C. § 1311(a).

346.    By committing the acts and omissions alleged above, TROJAN is subject to an assessment of civil penalties for each and every violation of the Act occurring from August 15, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

347.    An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which CCAT has no plain, speedy, or adequate remedy at law.

348.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth

COMPLAINT

hereafter.

## THIRD CAUSE OF ACTION
**Defendant's Failure to Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

349.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

350.   Defendants have not developed and implemented an adequate SWPPP for the Facility.

351.   Each day since August 15, 2012, that Defendants did not develop, *implement* and update an adequate SWPPP for the Facility is a separate and distinct violation of the Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

352.   Defendants have been in violation of the SWPPP requirements every day since August 15, 2012.  Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

353.   By committing the acts and omissions alleged above, TROJAN is subject to an assessment of civil penalties for each and every violation of the Act occurring from August 15, 2012 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

354.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which

COMPLAINT

harm CCAT has no plain, speedy, or adequate remedy at law.

355.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**FOURTH CAUSE OF ACTION**
**Defendant's Failure to Develop and Implement an**
**Adequate Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

356.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

357.    Defendants have not developed and implemented an adequate monitoring and reporting program for the Facility.

358.    Each day since August 15, 2012, that Defendants have not developed and implemented an adequate monitoring and reporting program for the Facility in violation of the Permit is a separate and distinct violation of the Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite collection/monitoring and analytical results are ongoing and continuous.

359.    By committing the acts and omissions alleged above, TROJAN is subject to an assessment of civil penalties for each and every violation of the Act occurring from August 15, 2012 to the present, pursuant to sections 309(d) and 505 of the Act,

COMPLAINT
78

33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

360.   An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm CCAT has no plain, speedy, or adequate remedy at law.

361.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### FIFTH CAUSE OF ACTION
**Defendant's Failure to Accurately Certify Compliance
in Annual Reports in Violation of the Permit and the Act
(33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

362.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

363.   Defendants have not accurately certified compliance with the Permit in each of the annual reports submitted to the Regional Board since at least August 15, 2012.

364.   Each day since at least August 15, 2012, that Defendants do not accurately certify compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants

continue to be in violation of the General Permit's certification requirement each day they maintain an inaccurate certification of compliance with the General Permit.

365.    By committing the acts and omissions alleged above, TROJAN is subject to an assessment of civil penalties for each and every violation of the Act occurring from March 2, 2011 to the present, pursuant to sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

366.    An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm CCAT has no plain, speedy, or adequate remedy at law.

367.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant(s) to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant(s) from discharging polluted storm water from the

COMPLAINT

80

Facility unless authorized by the Permit;

c. Enjoin Defendant(s) from further violating the substantive and procedural requirements of the Permit;

d. Order Defendant(s) to immediately implement storm water pollution control technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e. Order Defendant(s) to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f. Order Defendant(s) to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g. Order Defendant(s) to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h. Order Defendant(s) to pay civil penalties of up to $37,500 per day per violation for each violation of the Act since August 15, 2012, up to and including November 2, 2015, and up to $51,570 for violations occurring after November 2, 2015 pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i. Order Defendant(s) to take appropriate actions to restore the quality of

waters impaired or adversely affected by their activities;

j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.  Award any such other and further relief deemed appropriate by the Court.

DATED: March 15, 2018          Respectfully submitted,

                              By:   /s/ Jesse C Swanhuyser
                                    Jesse C. Swanhuyser
                                    Attorney for Plaintiff

COMPLAINT                                    82